515 P.2d 880

**The STATE of Arizona, Appellee,**

**v.**

**Robert Lee SKINNER, Appellant.**

**No. 2365.**

Supreme Court of Arizona,
In Banc.

Nov. 7, 1973.

Rehearing Denied Dec. 12, 1973.

Gary K. Nelson, Atty. Gen., Phoenix, by John S. O'Dowd and Howard L. Fell, Asst. Attys. Gen., Tucson, for appellee.

Messing, Hirsh & Franklin, P. C., by Robert J. Hirsh, Tucson, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal from a jury verdict and judgment thereon of guilty to the crimes of armed robbery, §§ 13–641 and 13–643(B) A.R.S., and first degree murder, §§ 13–451 and 13–452 A.R.S. The defendant was sentenced to concurrent terms of eight to ten years for the armed robbery and to life imprisonment for the murder. We are asked to answer the following questions on appeal:

A.  As to evidentiary matters:

1.  May a prior unsworn impeaching document of a State's witness be admitted substantively against a criminal defendant without violating the hearsay rule and the criminal defendant's right of confrontation?

2.  Was it reversible error for the State to impeach its own witness with prior inconsistent statements?

3.  Was the admission into evidence of four morbid autopsy pictures and a blood soaked shirt reversible error where a defendant did not dispute the fact that a murder was committed and the only issue for the jury to decide was whether the defendant had any connection with the commission of the homicide?

4.  Did the court erroneously deny the defendant the right to present evidence of a State witness's motive, bias, and interest in testifying?

5.  Did the admission into evidence of an accomplice's unsworn, out of court statement made at a time when the defendant was not present, violate the defendant's right of confrontation?

B.  As to misconduct of counsel:

1.  Was it reversible error for the prosecutor to call an accomplice to the stand, knowing that the accomplice would invoke the Fifth Amendment privilege not to testify in a case where the defendant's position was predicated on the mutual innocence of himself and the accomplice?

2.  Was it prejudicial and reversible error for the prosecutor, in closing argument, to willfully misstate material evidence to the jury with a view of purposefully misleading the jury as to the effect of that evidence?

3.  Was it prosecutorial misconduct and reversible error for the prosecutor to make repeated and warrantless objections to defense counsel's voir dire of the jury, opening statement, cross-examination of material witnesses, and direct examination of defense witnesses?

4.  Was it reversible error for the prosecutor to willfully fail to disclose evidence inconsistent with the state's case?

5.  Was it prosecutorial misconduct and reversible error for the prosecutor to continually and repeatedly violate the Code of Professional Responsibility and the American Bar Association's Minimum Standards for Prosecutors?

The facts necessary for a determination of this matter on appeal are as follows. Four men, Donnell Thomas, David O. Williams, Robert Lee Skinner (the defendant) and Paul Lawrence Wright were charged with the crimes of armed robbery, conspiracy to commit armed robbery, and murder. After a lengthy preliminary hearing on all of these charges, the magistrate held Donnell Thomas and David Williams to answer on the robbery and conspiracy counts. The magistrate at that time found that

there was not probable cause to hold either the defendant or Wright on any of the charges in the complaint and dismissed the complaint as to those two defendants. Later, pursuant to an ex parte petition by the county attorney, the court ordered that the preliminary examination as to defendant and Wright be reopened. Following the hearing of testimony the magistrate held the defendant and Wright to answer on all three counts of the complaint. As a result defendant and Wright petitioned this court for a writ of special action. This court accepted jurisdiction but denied the relief requested on 9 October 1970. Skinner v. Superior Court of State of Arizona in and for County of Pima, 106 Ariz. 287, 475 P.2d 271 (1970). Thereafter defendant's and Wright's cases were severed. Also Count I of the information charging Skinner with conspiracy to commit armed robbery was severed. Skinner then went to trial in the instant matter on Counts II and III of the information, armed robbery and murder, on 22 February 1971.

The incident from which these charges stemmed was the robbery of Crown Liquor Store in Tucson on 4 October 1969. The clerk, Mason Branch, was found dead of gunshot wounds, a victim of the robbery. The defendant Skinner did not dispute that the robbery and murder had taken place— the only issue was whether he was involved. Willie Dixon, a convicted felon, testified that he saw Skinner and Donnell Thomas inside the liquor store a short time before the murder and robbery took place. He further stated that he saw Skinner and Paul Wright at a friend's house a short time after the crime occurred. A fingerprint belonging to David Williams was found on a cigar box lying near the deceased inside the liquor store. The prosecutor, over defendant's objection, read to the jury a statement of George McDonald, an inmate of the Arizona State Prison and convicted felon that he, Robert Skinner, Paul Wright and Donnell Thomas had discussed robbing Crown Liquor in September 1969. McDonald then made a trip to California. When he returned he stated that Skinner approached him on 3 October 1969 and again asked him to rob Crown Liquor with Donnell Thomas and Paul Wright. McDonald refused. The next day, 4 October 1969, the three showed McDonald some pistols and talked about the robbery again.

McDonald testified at the trial, however, that his statement was untrue, that he was in jail at the time the statement was made and that he made the statement after being told that if he did so seven armed robbery charges against him would either be dropped or not filed. Also his aunt and uncle would get a $1,000 reward if he were to give a statement to the police.

There was testimony from one Lucius Sorrell, an admitted user of LSD and heroin and an inmate of the Arizona State Hospital, that Williams, Thomas, Skinner and Wright came to his apartment on the evening of 4 October 1969. At that time Donnell Thomas asked if he could borrow a gun. Sorrell stated that a short time thereafter Donnell Thomas came back and told him that he did not need the gun. Sorrell then stated that as he left his apartment a short time later he saw four people running across the park in a direction away from the liquor store. He claimed that these four people were Donnell Thomas, David Williams, Paul Wright and defendant. Sorrell's testimony was somewhat impeached on cross-examination by prior inconsistent statements and his credibility was damaged by the testimony of independent witnesses. Willie Dixon, for instance, testified that he saw Sorrell on the evening of 4 October in a stolen car apparently under the influence of narcotics. Dixon further testified that Sorrell did not live in that particular apartment and was not there on the day in question.

Skinner took the stand in his own behalf and testified that he spent the day with Thomas, Wright and Williams. He stated that the four of them were parked in front of the liquor store when Williams left the group stating that he was going to go in the liquor store to rob it. Skinner testified

that he and Paul Wright then left the car and proceeded toward his home on foot.

Skinner was the last defendant to be tried. Donnell Thomas was tried twice, the first trial ending in a mistrial as a result of a hung jury and the second trial resulting in a conviction of first degree murder with the jury assessing the death penalty. On appeal we affirmed the conviction, State v. Thomas, 110 Ariz. 120, 515 P.2d 865, No. 2199, filed this day. David Williams plead guilty to first degree murder and was given the death penalty by the sentencing judge. His case was reversed by this court in accordance with Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); State v. Williams, 107 Ariz. 421, 489 P.2d 231 (1971). On remand Williams again entered a plea to first degree murder and was given life imprisonment. Paul Wright was tried and found guilty of voluntary manslaughter, armed robbery, and conspiracy. The trial judge gave Wright probation.

A. As to Evidentiary Matters:

## SUBSTANTIVE USE OF McDONALD'S STATEMENT

At the trial George McDonald was called as a witness by the State. He was asked by the prosecutor whether he knew the defendant and the three other men, Donnell Thomas, Paul Wright, and David Williams. McDonald stated that he did:

"Q Now, going to the month of September, 1969, and on the day of September 6, 1969, did you have occasion to come in contact with this Defendant, Robert Lee Skinner, Paul Wright, and Donnell Thomas, and have a conversation about robbing the Crown Liquor Store?

"A No, I didn't.

   *     *     *     *     *     *

"Q On that same date did they ask you to rob Crown Liquor Store?

"A No, they didn't.

   *     *     *     *     *     *

"Q And on that same date did you tell the Defendant Robert Lee Skinner, Paul Lawrence Wright, and Donnell Thomas, to wait until you came back from California?

"A No.

   *     *     *     *     *     *

"Q Did you go to California in September of 1969?

"A Yes, I did.

"Q Mr. McDonald, on the 3rd of October, did Robert Lee Skinner, the Defendant here, talk to you and ask you to go with him and Donnell Thomas and Paul Wright and the person you call Newcomb at that time?

   *     *     *     *     *     *

"A Mr. Skinner never approached me and ask me about robbing anything.

"Q Would you answer the question?

"A No, he didn't.

"Q When I speak of Crown Liquor Store and in October, 1969, September, 1969, I am speaking of the Crown Liquor Store between Fourth and Sixth Avenue on Grant Road.

"A Yes.

"Q And you knew where it was?

"A Yes.

"Q And you understand that was the place I was talking about in the question?

"A Yes, I did.

"Q Did you tell the Defendant, Robert Lee Skinner, at that time that there was a black man working there and that someone would get hurt?

"A Yes—well, I don't know who was working there. I never told that man that.

"Q Did you know Mr. Mason Branch?

"A Yes.

"Q And you knew he worked at the Crown Liquor Store?

"A Yes, I did.

"Q Then on October 4th, didn't the Defendant Skinner again in the pres-

ence of Thomas, Donnell Thomas, David Oliver Williams and Paul Wright, again talk to you about helping them rob Crown Liquor Store?

"A No, they didn't.

"Q On that same date, the 4th of October, 1969, did they show you some pistols?

"A No, they didn't.

"Q When I speak of 'them,' I am speaking of the Defendant Robert Lee Skinner, Paul Wright, David Oliver Williams and Donnell Thomas?

"A I understand.

"Q Did they show you three pistols, a .22 or .25, a .22, a .25 and a .32 caliber?

"A No, they didn't.

* * * * * *

"Q Did this Defendant display any of those weapons to you on that date?

"A No, he didn't.

"Q Have you read the statement, which is State's Exhibit 66 for identification?

"A Yes, I have.

"Q And the statement was signed by you?

"A Yes, it was.

"Q And it was dictated by you?

"A Yes, it was.

"Q And the lady typed it as you dictated it?

"A Right."

Previous to this examination the court, out of the presence of the jury, had heard argument of counsel and had ruled that the statement of George McDonald would be admitted substantively. The prosecutor then read to the jury State's Exhibit 66 as follows:

"To Sergeant Bunting.

I, George McDonald make this following statement to the Deputy Muhl and De-

tective Angeley, to be used only if necessary to make the Crown Liquor homicide.

On September 6, 1969, myself and Robert Skinner and Paul Wright and Donnell Thomas were in the El Capitan Apartment B. El Capitan Apartment B, talking about robbing Crown Liquor. But I said, 'No. Wait until I come back from California.' I went to California. On the 11th of September, I came back. I came back on the 1st of October and Robert Skinner approached me again on the 3rd of October and then he asked me again to go with him, Donnell Thomas and Paul Wright and another fellow, possibly Newcomb or Newton, to rob Crown Liquor Store. Then I told him, 'No;' that there was a black man working there and that someone would get hurt. So they didn't go. Then Saturday, October 4th, they talked about it again, and this time showed me the pistol. There was three pistols: two .22's and one .25 or a .32 caliber, but I don't know which one was used to shoot him.

* * * * * *

I will only testify in court if it becomes absolutely necessary.

Signed George McDonald, typed George McDonald, witnessed L. W. Muhl, 248, signed by L. W. Muhl, signed by Rex Angeley, 285, typed by R. Lawrence, October 22nd at 69 at P.C.S.O. at 2215 hours."

McDonald further testified refuting all of the pertinent statements made to Detectives Angeley and Muhl. On cross-examination by defense counsel it was brought out that seven armed robbery charges which could have been filed against McDonald were not filed in exchange for his statement and that McDonald was in jail at the time he made the statement. It was also brought out that McDonald had refuted the statement on many occasions after he made it—both to the prosecutor and in

other legal proceedings concerning the Crown Liquor Store case.

There is no question that the statement could be admitted for the purposes of impeachment of the admittedly hostile witness. The precise question before this court, however, is whether the statement could be admitted substantively to prove the truth of the facts recited in the statement.

The trial court in admitting the statement of George McDonald into evidence did so on the basis of the United States Supreme Court's decision in California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L. Ed.2d 489 (1970). The Green case considered the constitutionality of § 1235 of the California Evidence Code which provides that "(e)vidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

Green, supra, rejected the orthodox view that such statements are inadmissible for the truth of the facts contained therein because they may not have been made under oath, the declarant may not have been subjected to cross-examination and the jury could not observe his demeanor at the time he made the statement. By contrast, the rule followed in Green, supra, would permit the substantive use of prior inconsistent statements on the theory that the usual dangers of hearsay are largely non-existent where the witness testifies at trial:

> " * * * The subsequent opportunity for cross-examination at trial with respect to both present and past versions of the event, is adequate to make equally admissible, as far as the confrontation clause is concerned, both the casual, off-hand remark to a stranger, and the carefully recorded testimony at a prior hearing. * * *" 399 U.S. 149 at 168, 90 S.Ct. 1930 at 1940.

Support for this latter position is contained in Rule 801 of the Proposed Rules of Evidence for United States Courts and Magistrates:

"(d) *Statements which are not hearsay*. A statement is not hearsay if—

"(1) *Prior statement by witness*. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, or (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive, or (C) one of identification of a person made after perceiving him; * * *"

And the note to that rule reads as follows:

"(A) Prior inconsistent statements traditionally have been admissible to impeach but not as substantive evidence. Under the rule they are substantive evidence. As has been said by the California Law Revision Commission with respect to a similar provision: 'Section 1235 admits inconsistent statements of witnesses because the dangers against which the hearsay rule is designed to protect are largely nonexistent. The declarant is in court and may be examined and cross-examined in regard to his statements and their subject matter. In many cases, the inconsistent statement is more likely to be true than the testimony of the witness at the trial because it was made nearer in time to the matter to which it relates and is less likely to be influenced by the controversy that gave rise to the litigation. The trier of fact has the declarant before it and can observe his demeanor and the nature of his testimony as he denies or tries to explain away the inconsistency. Hence, it is in as good a position to determine the truth or falsity of the prior statement as it is to determine the truth or falsity of the inconsistent testimony given in court. Moreover, Section 1235 will provide a party with desirable protection against the "turncoat" witness who changes his story on the stand and deprives the party calling him of evidence essential to his case.' Comment, California Evidence Code § 1235. See also McCormick § 39. The

Advisory Committee finds these views more convincing than those expressed in People v. Johnson, 68 Cal.2d 646, 68 Cal.Rptr. 599, 441 P.2d 111 (1968). The Constitutionality of the Advisory Committee's view was upheld in California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Moreover, the requirement that the statement be inconsistent with the testimony given assures a thorough exploration of both versions while the witness is on the stand and bars any general and indiscriminate use of previously prepared statements." Subdivision (d)(1)(A).

We are not concerned with the admissibility of the prior inconsistent statement but the use to which the statement may be put after the foundation for admission has been properly made. We have stated:

" * * * Where a witness testifies to something different from what he was expected to testify but whose testimony is not necessarily prejudicial or damaging to the cause of the party calling him he may be cross-examined by such party for the purpose of refreshing his memory and reference may be made to former statements made or testimony given by such witness for the purpose of refreshing his memory and in aiding him to testify to the truth. * * *

"However, before such witness can be impeached he must have testified to some fact that was prejudicial, damaging to the party calling him. * * *" State v. Lane, 69 Ariz. 236, 242, 211 P. 2d 821, 824–825 (1949).

Subject to the prior decision of this court as to when a person may cross-examine and impeach a witness, we believe that the better rule is to allow the substantive use of such statements, when properly admitted, and not limit them for impeachment only. In doing this we are persuaded by the futility of requiring that the trier of fact, be it judge or jury, consider such statements for the purpose of impeachment only and not for the truth of the facts

stated. We agree with Judge Learned Hand:

" * * * We should indeed welcome any efforts that help disentangle us from the archaisms that still impede our pursuit of truth." United States v. Allied Stevedoring Corp., 241 F.2d 925, 934 (2nd Cir. 1957).

We therefore hold that the prior decisions of this court, Otero v. Soto, 34 Ariz. 87, 267 P.2d 947 (1928); State v. Valenzuela, 101 Ariz. 230, 418 P.2d 386 (1966); and others which hold that such statements may not be used substantively are by this decision overruled. In deciding as we do, we do not extend the scope of admissibility of such statements, only the use to which such statements may be put once they have been properly admitted.

## IMPEACHMENT OF HIS OWN WITNESS BY PROSECUTION

Willie Dixon, an inmate of the Arizona State Prison, was called as a witness for the State. Dixon testified that a little after 9:00 p.m. on the evening of the homicide he saw defendant and Paul Wright at the home of a mutual friend. In response to the prosecutor's question, Dixon testified that David Williams the man whose fingerprints had been found in the store, was not with the other two alleged accomplices—Skinner and Wright—after the shooting. The prosecutor, over defendant's objections, tried to "refresh the witness' memory" to the effect that Williams and defendant were together. Dixon denied that Williams had been with defendant. An extensive discussion between court and counsel took place out of the presence of the jury. After hearing that the witness Dixon had, on previous occasions, testified that David Williams had been with defendant the court held that the State was entitled to read the transcript of Dixon's prior testimony to impeach him on this question. It was noted that Dixon had also previously testified at the trial of Paul Wright that Williams had not been present with defendant at the friend's house. The trial

judge instructed the jury that this evidence was to be used for impeachment only and not to be considered by them substantively. The prosecutor, over objection, cross-examined Dixon as to whether he had identified David Williams at defendant's preliminary hearing. Dixon stated that the David Williams was not the same "Davie" that he had seen at a friend's house the night of the crime. The State then called Superior Court Judge Ben Birdsall, who, acting as a magistrate, had presided over the preliminary hearing. Judge Birdsall was allowed to testify over objection that Dixon had identified David Williams at the preliminary hearing.

The early common law rule was that a party calling a witness was "bound by his testimony" and could not question the truth thereof. This is sometimes called the "voucher" rule and its historical origins may have come from the primitive English trial practice in which "oath-takers" were called to stand behind a particular party's position in any controversy.

We agree with the recent statement of the United States Supreme Court that "[w]hatever validity the 'voucher' rule may have once enjoyed, and apart from whatever usefulness it retains today in the civil trial process, it bears little present relationship to the realities of the criminal process." Chambers v. Mississippi, 410 U. S. 284, 296, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297, 309 (1973).

We have stated:

" * * * It was a rule of both the civil and common law that a party calling a witness was bound by his testimony and could not under any circumstances be heard to question the truth thereof, and that rule was strictly adhered to by both state and federal courts until after the middle of the nineteenth century except as it applied to witnesses which a party was compelled to call, such for example, as a witness to a will. * * * " State v. Lane, supra, 69 Ariz. at 241, 211 P.2d at 824.

In the Lane case, we indicated that while surprise is a condition precedent to cross-examining one's own witness, adversity or prejudice is a condition precedent to impeachment of one's own witness. We clearly distinguished between the right to cross-examine and the right to impeach. Before a party's witness may be impeached he must have testified to some fact that was prejudicial or damaging to the party calling him.

In the instant case, Dixon's statement that he had not seen the defendant with David Williams after the crime was prejudicial to the State's case. There was no eye-witness to the crime, and the State's case was necessarily built on a careful compilation of circumstantial evidence. Williams' fingerprints were found at the scene of the crime. The State needed to link defendant to David Williams. The prejudice of Dixon's testimony to the State's case is obvious; the need to impeach that testimony is clear. We believe the impeachment procedure was proper. See also State v. Clayton & Penrod, 109 Ariz. 587, 514 P.2d 720, filed September 27, 1973.

## PHOTOGRAPHIC EVIDENCE

The autopsy photos of the victim's body are the same as those offered at the trial of defendant's codefendant, Donnell Thomas. In State v. Thomas 110 Ariz. 120, 515 P.2d 865, No. 2199, filed this day, we held the pictures, though admittedly prejudicial, did serve the purpose of explaining the autopsy and illustrating the paths of the bullets. We find no abuse of discretion in admitting them into evidence.

## WAS DEFENDANT IMPROPERLY PROHIBITED FROM ELICITING EVIDENCE OF LUCIUS SORRELL'S MOTIVE IN TESTIFYING?

When Lucius Sorrell was first called to testify for the State he claimed that he was unable to remember the date and events surrounding this crime. The

trial judge ruled, after Sorrell's initial inability to testify responsively, that the preliminary hearing transcript could not be admitted into evidence because defendant's counsel had not been present at the preliminary hearing and therefore defendant would be denied his right to confrontation. Sorrell was again called by the State and he was able to recall the circumstances that he had previously testified to at the preliminary hearing. At this time Sorrell was subjected to thorough cross-examination by defendant's counsel. The jury was made aware that between the first time Sorrell testified and the second time he was visited by the prosecutor in this case, Horton Weiss, and was informed that a pending felony charge would be reduced to a misdemeanor. The jury was also made aware that Sorrell had a history of drug abuse and hospitalization in mental institutions.

Defendant contends, however, that contrary to State v. Briley, 106 Ariz. 397, 476 P.2d 852 (1970), the trial court erred in not permitting the defendant to call Detective Angeley to ask if he had promised Sorrell release on his own recognizance at the time Sorrell's original statement was obtained. Sorrell, on cross-examination, had stated he didn't know of any such arrangement.

We find no prejudice to the defendant in this ruling by the trial court. The defendant was allowed to cross-examine the witness Sorrell most thoroughly as to his motive and bias. The details of an apparent "deal" between the prosecutor and the witness were brought before the jury. The jury had more than enough facts on which to base its judgment as to the witness's credibility. We find no error.

## EVIDENCE OF STATEMENTS MADE BY AN ACCOMPLICE

The defendant next urges that it was reversible error to admit, over objection, testimony by Sorrell that on two occasions the accomplice, Donnell Thomas, outside the presence of the defendant, approached Sorrell and asked to borrow a gun.

It was apparent from the testimony presented, that before Lucius Sorrell testified, the defendant and Donnell Thomas were linked in the fact situation surrounding this crime. Under the facts in the instant case, there were two legal theories by which the testimony of Sorrell regarding Thomas' statements was properly admitted.

■ The first is that conspiracy need not be charged in order that proof thereof be admitted. Once the conspiracy has been shown a conspirator's extra-judicial statements may be introduced against fellow conspirators in spite of the hearsay rule, People v. Robinson, 61 Cal.2d 373, 38 Cal. Rptr. 890, 392 P.2d 970 (1964), and such evidence does not violate the Sixth Amendment. Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). In State v. Sullivan, 68 Ariz. 81, 200 P.2d 346 (1948), we cited with approval:

" 'The acts and declarations of a conspirator, when said or done in furtherance of the conspiracy and during its continuance, are admissible in evidence, when it is shown that a conspiracy exists and that the defendant against whom the evidence is offered and the person making the declarations are parties to the conspiracy. Each conspirator being the agent of his co-conspirator; his statements in furtherance of such conspiracy are binding on all. 16 C.J. 647, Sec. 1287; 22 C.J.S., Criminal Law § 756'." 68 Ariz. at 88, 200 P.2d at 351.

■ Additionally, the statement falls under an exception to the hearsay rule because it was prior to and close in time to the occurrence of the homicide. The statements were made during the pendency of the wrongful act by one of the co-conspirators and were made in furtherance of the conspiracy. This is a recognized exception to the hearsay rule. State v. Sullivan, supra; Ex parte Decker, 65 Ariz. 122, 175 P.2d 204 (1946); State v. Smith, 60 Ariz. 305, 135 P.2d 879 (1943); Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949); United States v. Ushakow, 474 F.2d 1244 (9th Cir. 1973).

"The recognized exception to the hearsay rule applicable here is that, notwithstanding its hearsay character, testimony of out-of-court declarations implicating another, offered to prove the other's guilt, is admissible if there is independent evidence that at the time of the declaration, the declarant and the other person were engaged in a concert of action involving the criminal conduct in question. (citations omitted)." United States v. Adams, 446 F.2d 681, 683 (9th Cir. 1971).

We hold that the admission into evidence of this testimony was proper.

B. Misconduct of Counsel:

Defendant next lists several incidents of alleged misconduct on the part of the prosecutor, Horton Weiss. We have stated:

" * * * Misconduct alone will not cause a reversal, as a new trial should not be granted to punish counsel for his misdeeds, but where the defendant has been denied a fair trial as a result of the actions of counsel, we will reverse. * * *" State v. Moore, 108 Ariz. 215, 222, 495 P.2d 445, 452 (1972).

Keeping this standard in mind, we will review the charges of misconduct raised by the defendant.

## WAS IT REVERSIBLE ERROR FOR THE PROSECUTOR TO CALL PAUL WRIGHT TO THE STAND, KNOWING WRIGHT WOULD TAKE THE FIFTH AMENDMENT?

Defendant's counsel told the jury in his opening statement that the evidence in this case would show that defendant and Paul Wright left the company of David Williams when Williams announced his intention to commit this crime. Defendant's counsel advised the court that the prosecutor intended to call Wright to the stand in order to have Wright take the Fifth Amendment in front of the jury. Defendant's counsel asked that the court make a determination of whether Wright would invoke the Fifth Amendment privilege. During this argument in chambers, the following took place between the court and the prosecutor:

"THE COURT: If he takes the Fifth, you are going to object that he can't properly take the Fifth?

"MR. WEISS: Yes. How could he incriminate himself if he has already given the statements?"

Over defendant's objections, Wright, represented by counsel, was called to the stand:

"DIRECT EXAMINATION BY MR. WEISS:

"Q State your full name, please.

"A Paul Lawrence Wright.

"Q Do you live in Tucson?

"A Yes.

"Q How long have you lived in Tucson?

"A About six years.

"Q Do you know a person by the name of Robert Lee Skinner?

"A I refuse to answer on the grounds it might incriminate me.

"MR. HIRSH: I would request at this time the prosecutor grant immunity to this witness to enable him to testify to any matters concerning Robert Lee Skinner under Arizona Revised Statutes.

"MR. WEISS: I am not going to grant him immunity and will not grant him immunity.

*   *   *   *   *   *

"Q Do you know a person by the name of Donnell Thomas?

"A I refuse to answer on the grounds it might incriminate me.

"Q Do you know a person by the name of David Oliver Williams?

"A. I refuse to answer on the grounds it might incriminate me.

"Q Calling your attention to the date of October 4, 1969, did you have occasion to be with Robert Lee Skinner, David Oliver Williams, and Donnell Thomas?

"A    I refuse to answer on the grounds it might incriminate me.

"THE COURT: Mr. Salter, let me ask you this: Apparently you are advising your client and it is going to be your advise to your client to have him take the Fifth concerning anything that might be related in any way to anything we have before us in this case, is that correct?

"MR. SALTER: That is correct, Your Honor.

"MR. WEISS: One more question.

"THE COURT: Tell me what the question is going to be first.

"MR. WEISS: I am going to ask him if he went with Donnell Thomas, David Oliver Williams and Robert Lee Skinner and Donnell Thomas to the area of the Crown Liquor Store.

"THE COURT: No. I think the indication is and I will not allow any further questions on that, based on the response Mr. Salter made. If you have any questions outside of this area, I will allow you to ask them."

The District of Columbia Circuit has discussed this matter as follows:

"The question before this court is whether the proceedings involving the witness were so unfair in their prejudice to the defendant on trial as to constitute reversible error. The question is not new. It has been considered by several Circuit Courts of Appeals and was before the Supreme Court last term in Namet v. United States. [footnote omitted] The Court referred to several federal cases and said that none of them suggests that reversible error is invariably committed whenever a witness claims his privilege but that rather those courts 'have looked to the surrounding circumstances in each case, focusing primarily on two factors, each of which suggests a distinct ground of error.' [footnote omitted] One of these grounds relates to prosecutorial misconduct, and the other

'seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant.' [footnote omitted]" Fletcher v. United States, 118 U.S.App.D.C. 137, 332 F.2d 724, 726 (1964).

In Fletcher, the conviction was reversed because the court determined that the witness's refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination and thus unfairly prejudiced the defendant. The circumstances considered by the court in Fletcher, in reversing for prejudice, were (1) that the government and the court both knew that the witness would refuse to testify upon his claim of privilege under the Fifth Amendment; (2) the prosecutor asked a series of questions which depicted the alleged offense in its entirety; (3) the testimony sought was the principal source of support for the testimony of the government's only witness; (4) the witness's refusals to testify were not incidents in the course of other testimony given by him; he gave no other testimony; (5) the refusals were not mere incidents in a long trial; it was a short trial and the witness's part in it was a major feature of the proceeding.

In Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), the court did not find reversible error because: (1) There was no inference of prosecutorial misconduct (even though it had been announced that the witnesses would invoke their testimonial privilege if questioned, the prosecutor did not believe they could claim the privilege since they had previously plead guilty). (2) The witnesses had nonprivileged information which could be and was used to corroborate the government's case. (3) On only a few of the prosecutor's questions was privilege invoked. The court said that "these few lapses," when viewed in the context of the entire trial did not amount to deliberate at-

tempts by the government to profit from the witnesses' refusal to testify. (The defense counsel had also failed to object.)

In the case now before us we find no specific misconduct on the part of the prosecutor in calling Paul Wright to the stand since the court had given permission for him to do so. Furthermore, there was other evidence during the trial to link the defendant with Wright. Wright's testimony was not a major occurrence in this trial. It was a short incident in a very lengthy trial. Given these circumstances, we find no reversible error on this issue.

### MISLEADING THE JURY

■ When the court allowed the prosecutor to impeach Willie Dixon by use of a transcript of prior testimony, the court specifically instructed the jury to consider the transcript for impeachment purposes only. During his closing argument the prosecutor told the jury that the evidence showed that defendant and Williams were together after the shooting. He failed to make the distinction to the jury that the reading from a transcript of a prior proceeding was for impeachment only. Due to the heated battles during this case, the trial judge had instructed counsel not to make any objections during closing arguments. Obeying this instruction, defense counsel did not object to the prosecutor's misstatement.

There was ample substantive evidence during the trial to link the defendant with Williams after the shooting. Although the conduct of the prosecutor in this regard is far short of exemplary, we find his failure to distinguish between substantive and impeachment evidence is not prejudicial.

### DID THE PROSECUTOR'S REPEATED OBJECTIONS THROUGHOUT ALL STAGES OF THE TRIAL PREJUDICE THE DEFENDANT?

■ We have read the complete transcript of the trial and we find no error or undue limitations on defendant's rights. State v. Moore, supra.

### FAILURE TO DISCLOSE FAVORABLE EVIDENCE

The misconduct complained of by the defendant is as follows:

1. Failure to disclose three witnesses that were available to impeach Willie Dixon's testimony as to his whereabouts on the night in question.

2. Failure to correct George McDonald's testimony that he had no prior felony convictions.

3. Failure to correct testimony of Lucius Sorrell regarding whether a deal had been made in exchange for his testimony.

■ Prior to the start of this trial, defendant made numerous motions for discovery, including a motion under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), for disclosure of material favorable to the defendant. Upon representation by the prosecutor, Horton Weiss, that he had no such information, no order for disclosure was made. During the trial, the defendant's counsel moved for a mistrial for failure of the prosecution to provide him with some of the information contained in the report of Detective Angeley which report the court had ordered produced. The information was to the effect that Detective Angeley had spoken with two women who gave him information regarding the whereabouts of Donnell Thomas and Willie Dixon on the night of the Crown Liquor Store robbery. At the time of the trial the whereabouts of the two women were unknown. The court, after reading the report, found nothing in Detective Angeley's report to contradict the testimony that had already been given during the trial. We find no error.

■ As to the failure to correct George McDonald's testimony that he had no prior felony convictions, defendant admits that he did not recall McDonald to re-examine and impeach him on his prior felony conviction. As the State points out, even if the prior had been brought out it would only have served to show an inducement for McDonald's statement to the po-

lice, a fact which had already been brought out by showing that he had seven armed robbery counts which were, according to McDonald, dropped as a result of his giving the statement. We find no prejudice.

As to the alleged failure to correct Sorrell's testimony, the fact that the prosecutor had made a deal with Lucius Sorrell, if not directly told to the jury, was certainly made obvious by the following testimony:

"Q Lucius, where are you living right now?

"A Nowhere.

"Q You are not living anywhere? You are living over at the County Jail, aren't you?

"A That is not living. I am there. I am not living.

"Q I understand, but you are staying there?

"A Yes.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q Did you have criminal charges pending against you on Saturday?

"MR. WEISS: I object.

"Q Saturday of last week?

"MR. WEISS: Immaterial and irrelevant.

"THE COURT: Overruled.

"A I couldn't be sure. Really, I don't know.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q Did you talk to Mr. Weiss on Saturday?

"A Yeah.

"Q You talked to him. Did you talk to Mr. Weiss on Sunday?

"A Yeah.

"Q Were you told that felony charges were going to be reduced to a misdemeanor?

"A He said he would see about it.

"Q He would see about it.

"A Yeah.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q You and Mr. Weiss, did you have a chat on Saturday?

"A Yes. He asked me like why I did not testify.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q Lucius, what else did you and Horton Weiss talk about Saturday besides your being tired when you came into court last week?

"A He said why didn't I testify and that I testified before, and if I was thinking about it, and everything, and that he was going to have a lawyer talk to me.

"Q Did he do that for you?

"A Yeah.

"Q When did you talk to your lawyer?

"A The next day.

"Q Did you talk to Mr. Weiss again?

"A Yeah.

"Q Was there a discussion then about these changes that caused you to be in the County Jail being reduced against you?

"A Well, like he didn't say it. My lawyer did.

"Q Your lawyer said that?

"A Yeah.

"Q He told you the felony charges against you were going to be dropped?

"A He said they could be dropped if I testified; not dropped but reduced.

"Q You would have to testify and then they would reduce it to a misdemeanor?

"A That would be better for me to do that."

The jury was made aware of the dealings between the witness and the prosecutor. They could weigh this in determining the credibility of the witness. We find no prejudice to the defendant.

## VIOLATION OF THE ABA STANDARDS

Defendant next contends that it was reversible error for the prosecutor to continually and repeatedly violate the trial judge's orders, the Code of Professional

Responsibility, and the American Bar Association's Minimum Standards for Prosecutors.

A party is entitled to a fair trial, not a perfect one. For the purpose of appeal of a criminal case, we will review misconduct on the part of a prosecutor to determine whether the defendant has been denied a fair trial. While the Code of Professional Responsibility and the Minimum Standards for Prosecutors are certainly helpful in determining whether or not the conduct complained of is acceptable, the question before us is whether the trial is fair. If the trial is fair, we will not reverse merely to punish the misdeeds of counsel. State v. Moore, supra. We find no error.

Judgment and sentence affirmed.

HAYS, C. J., STRUCKMEYER, J., and HERBERT F. KRUCKER, Court of Appeals Judge, concur.

NOTE: Justice LORNA E. LOCKWOOD did not participate in the determination of this matter.

HOLOHAN, Justice (dissenting).

In two matters I find myself in disagreement with the decision of the majority in the instant case. I concur in the holding as to the other matters, but in the matter of the introduction of the statement of George McDonald and the impeachment of Willie Dixon I must dissent.

In the matter of the impeachment of Willie Dixon the rule followed in Arizona was as set forth in State v. Lane, 69 Ariz. 236, 211 P.2d 821 (1949). I disagree with the majority's analysis of the Lane case. The author of the majority opinion reads Lane as if the right to impeach one's own witness, not originally called as a hostile witness, did not require a showing of surprise. The requirement of showing surprise to both cross-examine and impeach is clearly stated in Lane. This Court held in Lane that a person calling a witness would be permitted to show prior inconsistent statements if the party was actually surprised by the tesimony of the witness and such testimony was damaging to the case of the party calling the witness. "If there exists no surprise such evidence should not be admitted." 69 Ariz. at 241 and 242, 211 P.2d at 824. For an additional discussion of this subject see Young v. United States, 97 F.2d 200, 117 A.L.R. 316 (1938).

Irrespective of whether the analysis of the Lane decision is correct or not, the majority have apparently abandoned the rule established in the case, and this position becomes clearer in allowing the admission in evidence of the prior statements of George McDonald. In neither the instance of McDonald nor of Dixon was the prosecution surprised at the testimony given on the stand for these witnesses had repudiated their statements or former testimony before being called as a witness in this case. McDonald had given an unsworn statement while he was in custody and faced with a number of felony charges. It is conceded that some seven charges of armed robbery were not filed against McDonald after he gave a statement to the prosecution implicating the defendant. Later McDonald repudiated the statement on several occasions, and the prosecutor was well aware that the witness had repudiated the statement.

Under the rule in Young and Lane and the traditional American rule, the prosecutor would not be able to use McDonald as a witness. As pointed out in Young, the prosecutor could not call the witness knowing that the witness would not testify according to the previous statement, claim surprise, and expect to use the previous statement to impeach the present testimony of the witness. Such an artifice to get hearsay evidence in the record was condemned in Lane.

The majority holds that the position set out in Rule 801 of the proposed Rules of Evidence for United States Courts and Magistrates is now the rule in Arizona. Under this proposed rule not only was the statement of McDonald available for use as impeachment, it was also admissible as substantive evidence. Interestingly enough

the majority adopts a rule which as yet has not been adopted for the United States Courts, but the constitutionality of the proposed rule for use by State Courts has been approved in California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Chief Justice Burger points out in his concurring opinion that the holding of the Court in *Green* was that the California statutory rule of evidence was not in violation of the Sixth and Fourteenth Amendments to the Federal Constitution. It must be noted, however, that the Chief Justice also points out a caution which this Court should have accepted:

> "Here, California, by statute, recently adopted a rule of evidence that, as Mr. Justice WHITE observes, has long been advocated by leading commentators. Two other States, Kentucky and Wisconsin, have within the past year embraced similar doctrines by judicial decisions. *None of these States has yet had sufficient experience with their innovations to determine whether or not the modification is sound, wise, and workable.*" (Emphasis supplied.) 90 S.Ct. 1930 at 1941–1942.

Despite such caution this Court has chosen to experiment without any real need being shown.

In People v. Johnson, 68 Cal.2d 646, 68 Cal.Rptr. 599, 441 P.2d 111 (1968), prior to the *Green* case, the California Supreme Court had repudiated the *Green* and proposed Federal rule. The California Supreme Court describes the rule as the "academic position." A reading of the decision in *Johnson* gives a sound basis why the academic position should not be accepted by this Court.

There are those who argue that the proposed rule is one of necessity; that a party very often has little choice as to its witnesses. The prosecutor and defense must accept the case as it is with the necessity of using as witnesses those who have knowledge of the facts of the case; therefore a party should be free to use a prior out-of-court statement for any purpose. The foregoing is seemingly a logical and reasonable position were it not for the dangers attendant to it, and the case at issue certainly highlights some of the dangers. In order to secure a statement favorable to the position of a party, does the proposed rule aid in securing truth or falsity? Was McDonald actually telling the truth in his statement concerning the defendant and the dropping of seven felony charges merely an inducement to secure the truth—or was he lying? The rule is available to the defense as well as the prosecution. Does the academic position aid in the quest for truth? My fear is that it provides a tool for the unscrupulous, dishonest, and crafty to obscure the truth. The temptation to get a favorable unsworn statement from a witness at any cost will be tremendous. The object is to get some favorable version on paper, worded, as far as the witness will permit, in the most favorable terms for the party taking the statement. There is no longer any need to get the real version from the witness—anything he'll sign can be used, and, if he balks, his statement can be used. What was advertised as the cure for the turncoat witness may turn out to be a plague on the rest of our system of evidence.