523 P.2d 1316

**The STATE of Arizona, Appellee,**

v.

**Adolphus LEWIS, Appellant.**

**No. 2909.**

Supreme Court of Arizona,
In Banc.

June 24, 1974.

Gary K. Nelson, Atty. Gen. by R. Wayne Ford, Asst. Atty. Gen., Phoenix, for appellee.

James Hamilton Kemper, Phoenix, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal from a jury verdict and judgment of guilt to the crime of robbery, § 13–641 and § 13–643, as amended 1967, A.R.S., and a sentence thereon of not less than fifteen nor more than twenty five years in the Arizona State Prison.

Defendant raises two questions on appeal. They are:

1. Was it reversible error for the trial court to allow the prosecutor to cross-examine and impeach his own witness, Katie Brown?

2. Was it reversible error for the trial court to give, on its own motion, a cautionary instruction regarding the use to be made of Katie Brown's prior inconsistent statement?

The facts necessary for a determination of this matter on appeal are as follows. In the early morning of 6 September 1973, the defendant, his brother, Melvin Lewis, a girl named Mary Ann Williams, a girl named Katie Brown, and a girl named Cherry Jones, age 15, were in a bar on Buckeye Road in Phoenix, Arizona, at closing time. At that time the victim, a white male driving a 1966 Thunderbird automobile, was observed "cruising" the vicinity. He stopped and Melvin Lewis talked to the driver. Melvin Lewis convinced Cherry Jones to agree to go with the victim for the alleged purpose of performing an act of prostitution. By prearrangement, however, she was to have the victim drive to the corner of 13th Avenue and Grant where he was to be robbed. The other members of the group flagged down an automobile and rode to the corner before the victim and Cherry could arrive. They hid behind some bushes across the street. After the group arrived, Katie Brown, who had a .22 pistol concealed in her bra, gave the pistol to Mary Ann Williams. This gun in turn came into the possession of someone, allegedly the defendant. After the car arrived and Cherry Jones had left the car, the party went over to the car where the victim was beaten. He got out and ran, and was shot in the back by the .22 pistol. The defendant then drove the victim's Thunderbird away from the scene.

Trial was held in January of 1974 at which time the defendant testified denying he had shot the victim. The jury returned a verdict of guilty as to the robbery charge but was unable to reach a verdict on the murder charge.

## CROSS–EXAMINATION OF KATIE BROWN BY THE PROSECUTOR

Katie May Brown was an important witness to the State. She had been with the defendant the night of the shooting, stood across the street from the car before the shooting, and the gun used in the killing was her gun. She testified that she kept the gun, a .22 pistol, in her bra, and because it was beginning to hurt her, gave it to another one of the girls present, named Mary Ann, and that Mary Ann either gave the gun to the defendant or the defendant took the gun from her. Katie Brown, with her attorney present, had her deposition taken prior to the trial. She had told the county attorney at that time that the defendant, Adolphus Lewis, admitted to her that he shot the man. Katie Brown was called as a State's witness and when she reached this point the following transpired:

"Q Did Adolphus tell you that he had shot the man?

"A Well, he didn't speak directly to me, but that was what the conversation was about, you know, who did the shooting. I didn't hear anybody, you know, exact—say exact who shot him.

"Q Well, what did you hear said?

"A Well, I just heard them say that he had been shot.

"Q Do you recall giving a sworn statement on October the 26th, 1973, before a Court Reporter?

"A I don't know.

"Q Do you recall being asked some questions by a Mr. Dennis Dairman of the County Attorney's Office?

"A Yes.

"Q Do you remember Mr. Jerry Stewart being there?

"A Yes.

"Q  Mr. Stewart was your attorney, wasn't he?

"A  Yes.

"Q  Do you remember Mr. Conrad Blain being there, Court Reporter?

"A  Well, there were some men there, but I don't remember the names of all of them.

"Q  You remember being asked some questions? And do you remember giving some answers on that day?

"A  Yes.

"Q  Do you recall giving some answers on that date that are different from what you have said just now?

"A  No.

\*      \*      \*      \*      \*      \*

"Q  Do you recall being administered an oath on that date?

"A  Yes.

"Q  To tell the truth?

"A  Yes.

"Q  Do you recall being asked, 'Did Adolphus tell you that he shot the man?'

"MR. WILSON: Just a moment, objection on the ground of impeaching his own witness.

"MR. HAMMOND: Your Honor, in view of the statement, I must claim surprise. The witness has given an inconsistent answer.

"THE COURT: Let me see it.

Objection is overruled.

"BY MR. HAMMOND:

"Q  Do you recall, after having been asked, 'Did Adolphus tell you that he shot the man,' answering, 'Yes. He mentioned something about it the next night, that he had shot him.'

"A  Yes, he did.

"Q  Is that correct?

"A  Yes.

"Q  So it is true that he did tell you the next night that he had shot him?

"A  He didn't speak directly to me. He was speaking to all of us that were there. He did mention something about it.

"Q  He did tell all of you who were there that he had shot the man?

"A  Yes, he said that the man was shot.

"Q  Did he tell you that he had shot the man?

"MR. WILSON: I object as a cross-examination of his own witness, as well as impeachment.

"THE COURT: Overruled.

"BY MR. HAMMOND:

"Q  Please answer.

"A  Did he tell me that he had shot the man?

"Q  Did he say that in your presence?

"A  Yes.

"Q  That was there at Dixson's the next night?

"A  Yes."

We have previously stated:

"The early common law rule was that a party calling a witness was 'bound by his testimony' and could not question the truth thereof. This is sometimes called the 'voucher' rule and its historical origins may have come from the primitive English trial practice in which 'oathtakers' were called to stand behind a particular party's position in any controversy.

"We agree with the recent statement of the United States Supreme Court that '[w]hatever validity the "voucher" rule may have once enjoyed, and apart from whatever usefulness it retains today in the civil trial process, it bears little present relationship to the realities of the criminal process.' Chambers v. Mississippi, 410 U.S. 284, 296, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297, 309 (1973).

\*      \*      \*      \*      \*·      \*

"In the Lane case, we indicated that while surprise is a condition precedent to cross-examining one's own witness, adversity or prejudice is a condition precedent to impeachment of one's own witness. We clearly distinguished between the right to cross-examine and the

right to impeach. Before a party's witness may be impeached he must have testified to some fact that was prejudicial or damaging to the party calling him." State v. Skinner, 110 Ariz. 135, 142, 515 P.2d 880, 888 (1973).

■ In the instant case, the prosecutor had a right to rely on the witness's previously sworn testimony that the defendant had admitted to her that he did in fact shoot the victim. When he asked her the same question on the stand she backtracked and the prosecution was obviously surprised. Not only was he surprised, but we believe that the evidence that she gave was potentially damaging to the prosecution in that it indicated that the defendant did not admit shooting the deceased. We therefore believe that the prosecution had the right not only to cross-examine his own witness at this point, but could even impeach by prior inconsistent statements. State v. Skinner, supra; State v. Lane, 69 Ariz. 236, 211 P.2d 821 (1949).

We find no error.

## ERROR FOR THE COURT TO INSTRUCT THE JURY ON THE USE TO BE MADE OF KATIE BROWN'S PRIOR INCONSISTENT STATEMENT

■ Although he did not request a cautionary instruction, defendant nevertheless contends that it was fundamental error for the trial court to fail, upon its own motion, to instruct the jury that Katie Brown's prior inconsistent statement could be used only for the purpose of impeachment and not for its substantive value. He cites State v. O'Dell, 108 Ariz. 53, 492 P.2d 1160 (1972). This case was tried to the jury in January of 1974 and after our case of State v. Skinner, supra, decided 7 November 1973.

In Skinner, supra, as to the use of prior inconsistent statements, we stated:

"We therefore hold that the prior decisions of this court, Otero v. Soto, 34 Ariz. 87, 267 P. 947 (1928); State v. Valenzuela, 101 Ariz. 230, 418 P.2d 386 (1966); and others which hold that such statements may not be used substantively are by this decision overruled. In deciding as we do, we do not extend the scope of admissibility of such statements, only the use to which such statements may be put once they have been properly admitted." State v. Skinner, supra, 110 Ariz. at 142, 515 P.2d at 887.

We find no error.

Judgment affirmed.

HAYS, C. J., and STRUCKMEYER and LOCKWOOD, JJ., concur.

HOLOHAN, J., did not participate in the determination of this matter.