495 P.2d 445

The STATE of Arizona, Appellee,

v.

Robert Bruce MOORE, Jr., Appellant.

No. 2258.

Supreme Court of Arizona,
In Division.

April 7, 1972.

Gary K. Nelson, Atty. Gen. by William P. Dixon and Mary Z. Chandler, Asst. Attys. Gen., Phoenix, for appellee.

Laber, Morrow & Lovallo by Paul W. Colarich, Jr., Tucson, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal from a jury verdict and judgment of guilt and a sentence of not less than ten nor more than twenty years for the crime of robbery in violation of § 13–641 and § 13–643, subsec. B, A.R.S. We are called upon to answer three questions on appeal:

1. Was it error for the trial court to allow the jury to hear evidence of another armed robbery and an attempted murder, involving the defendant and four other persons, occurring some 42 days after the commission of the crime for which defendant was on trial?

2. Did the trial court err in admitting a "mug shot" of defendant taken some time before the crime for which he was on trial?

3. Did the prosecuting attorney so conduct himself as to deny the defendant a fair trial?

The facts necessary for a determination of this matter are as follows. On 8 April 1969, at approximately 8:00 a. m., defendant entered a convenience market in Tucson, Arizona, called "The Party House." Mrs. Uhde, a part-owner of the store, and Mrs. Torell, an employee, were in the store at that time. About five minutes later, Mrs. Uhde left the store. A few minutes later another man entered the store, and he and the defendant ordered Mrs. Torell to open the cash register and then to lie down on the floor. She stayed there until a customer arrived at the gas pumps outside, at which time she ran outside and asked the customer to call the police. A few minutes later the police arrived.

Mrs. Torell, after describing the persons involved in the robbery to the police officers, was taken to the police department where she was shown a group of approximately fifty photographs and asked if she could identify any of them as either of the men who robbed her. She picked out the photograph of the defendant. Detective Angeley then drove Mrs. Torell back to the Party House where he showed the same group of photographs to Mrs. Uhde. Mrs. Uhde also picked out the photograph of the defendant. On at least three other occasions Mrs. Torell was shown the photograph of defendant, and, on at least three other occasions, she picked out defendant's photo. Mrs. Torell also identified the defendant at the preliminary hearing.

The first trial of this matter ended in a mistrial. At the trial in question, counsel for the prosecution was allowed to introduce, over objections of the defendant, evidence of a robbery of a service station and attempted murder committed by the defendant and four other persons some 42 days after the crime for which defendant was being tried. During the eight days of the trial in question, the attorney for the State, Mr. Horton Weiss, interposed a continuous barrage of mostly improper objections to questions asked by the defendant's attorney. From the record before this court it is apparent that the objections were excessive in number, inartfully stated (if not ill-founded), and materially impeded the orderly course of the trial. Defendant raises several points on appeal, but we believe it necessary to consider only the three discussed below.

## EVIDENCE OF THE OTHER ROBBERY

■ Defendant's first assignment of error concerns the admissibility of evidence of an armed robbery of an Enco service station and attempted murder of the station's attendant committed by defendant and four other persons some 42 days after the crime for which defendant was being tried.

The general rule in Arizona has long been:

"* * * in the prosecution of one accused of a particular offense, evidence showing or tending to show the commis-

sion by accused of another crime entirely distinct and independent of that for which he is on trial, even though it be a crime of the same class, is neither relevant nor admissible." State v. Dorsey, 25 Ariz. 139, 143, 213 P. 1011, 1012 (1923).

See also, Greve v. State, 36 Ariz. 325, 285 P. 274 (1930) and State v. Parker, 106 Ariz. 54, 470 P.2d 461 (1970). This court, however, has recognized exceptions to this rule under which evidence of other crimes or misconduct is admissible to prove the crime charged. Such evidence is admissible when it tends to establish: (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes, so related to each other that proof of one tends to establish the others; and (5) the identity of the person charged with the commission of the crime on trial. Dorsey v. State, supra; State v. Little, 87 Ariz. 295, 350 P.2d 756 (1960); State v. Tisnado, 105 Ariz. 23, 458 P.2d 957 (1969).

■ From a review of the record, we can find no facts which would bring the robbery of the Enco station within the exception recognized by the Arizona cases. The State argues that the evidence of the Enco robbery shows a "common scheme or plan" in that there were similarities in the two crimes. As examples of such similarities, the State points to the fact that the defendant and his participant in the Party House robbery were the only active participants in the Enco robbery, although there were allegedly five participants involved in the Enco robbery. In addition, the State points to the fact that a gun was used in each robbery, both robberies were timed to occur when the business was empty of customers, and both robberies were the "hit and run" type with automobiles used as the escape vehicle in each. The State further contends that there was a "plan" to rob the Enco service station. As to the "common plan or scheme" exception, this court has stated:

"Similarities between the offenses at Hamilton's Corner and that near the Southside Tavern must be in those important aspects where normally there could be found differences. Evidence is not admissible except as it may show a tendency or likelihood of a plan common to all offenses to commit the crime. (citation omitted)" State v. Adkins, 94 Ariz. 263, 266, 267, 383 P.2d 180, 182, 183 (1963).

The areas of similarity pointed to by the State as evidence of a plan common to each robbery are not areas where dissimilarity would be expected. The use of guns and getaway vehicles and the occurrence of the robberies at times when there were no customers can hardly be relied upon to show a common plan or scheme. Furthermore, the allegation by the State that the Enco robbery was planned in no way leads to the conclusion that it was part of an overall plan which also included the Party House robbery, nor does the record lead to such a conclusion. See State v. Little, supra.

As to the admissibility of this evidence to prove identity, while it may be true that one of the participants in the Enco robbery also participated in the robbery of the Party House, the connection ends there. The robberies took place 42 days apart; there was nothing in the "modus operandi" of the robberies that would identify the perpetrator of the Enco robbery as the perpetrator of the Party House robbery, nor were the circumstances surrounding the robberies sufficiently similar to prove identity. See Greve v. State, supra:

"* * * That a person has committed one crime has no direct tendency to show he has committed another similar crime, which had no connection with the first, and a person charged with one offense cannot be expected to come to court prepared to meet the charge of another. If the doing of one wrongful act shall be deemed evidence to prove the doing of another of a similar character, which has no connection with the first, issues would be multiplied indefinitely without previous notice to the defendant, and greatly to the distraction of the jury.

"The general rule is that when a man is put upon trial for one offense, he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and that, under ordinary circumstances, proof of his guilt of one or a score of other offenses in his lifetime is wholly excluded. (citations omitted)." Quen Guey v. State, 20 Ariz. 363, 368, 369, 181 P. 175, 177 (1919). See also Greve v. State, supra.

■ We agree with the Oklahoma Court of Criminal Appeals:

"This Court stated in the case of Bunn v. State, 85 Okl.Cr. 14–21, 184 P.2d 621–624:

'There have been many instances of abuse of this exception to the general rule above noted. The abuse of this rule has caused the reversal of more cases on appeal to this court in recent years than that of any other one matter.'

'The court has repeatedly held that this exception and other exceptions to the general rule are to be used with the utmost caution and that the court must perceive a visual connection and in case any doubt is entertained, it is to be resolved in favor of defendant. The exception to the general rule is not secondary to the rule and before evidence of other crimes can be competent or admissible in a criminal trial to prove the specific crime charged on the grounds of common scheme or plan, the two or more crimes must be so clearly related that the proof of one tends to establish the other and should never be admitted when it tends to show that the accused has committed other crimes wholly independent of that for which he is on trial.' " Hardin v. State, Okl.Cr., 462 P.2d 357, 359, 360 (1969).

There is no doubt that the evidence of the Enco robbery was highly prejudicial, especially due to the fact that the prosecution was allowed to go into the details of not only the robbery, but also the attempted murder. We believe it was error to admit the evidence of the other unrelated robbery.

### THE MUG SHOT

■ The prosecution presented evidence, over objections, that after the robbery and before the arrest of the defendant, the two witnesses who worked at the market identified the defendant from among some 50 photographs. The photograph identified "Exhibit A" below was admitted over objection into evidence.

EXHIBIT A

[726Z]

Defendant contends that it was error to have this "mug shot", obviously taken some time before the crime for which he was on trial, admitted in evidence and shown to the jury. The jury was also told that the photograph was taken some two months before the crime for which he was being tried.

We have had occasion to rule on the use of the term "mug shot" by a police officer testifying at trial. In that case, even though the mug shot was not shown to the jury, we held that the use of the term by the police officer was reversible error, stating the words "mug shot" could lead the jury to only one conclusion—that the defendant had been previously arrested:

> "The testimony of the officer using the term 'mug shot' was prejudicial error which requires a new trial." State v. Jacobs, 94 Ariz. 211, 214, 382 P.2d 683, 685 (1963).

Our Court of Appeals has more recently reversed a conviction in a case wherein a mug shot was admitted in evidence at trial with tape covering the numbers. The Court of Appeals stated:

> "It is this Court's opinion that the double-shot picture with front and profile alongside each other, unless disguised so as not to appear to be a 'mug shot', and absent an explanation that the picture was taken at defendant's arrest on the charge involved, intimates to the jury that defendant had a prior criminal record." State v. Cumbo, 9 Ariz.App. 253, 256, 451 P.2d 333, 336 (1969).

Although the mug shot admitted in the instant case was scissored to remove the numbers from the photograph, the testimony indicated it was taken before his arrest and we hold that its admission was prejudicial error. State v. Jacobs, supra, and State v. Cumbo, supra.

## MISCONDUCT OF PROSECUTING ATTORNEY

■ Defendant's final contention is that the prosecuting attorney so misconducted himself during the trial as to deny the defendant a fair trial. A review of the record discloses that, on several occasions, counsel for the prosecution was admonished for arguing with the judge and interrupting defense counsel with repeated objections, most of which were overruled. For example:

"THE COURT: One at a time. He has never had the question answered yet, Mr. Weiss, because you have objected every time, and I overruled it, and then when he asked to have it reread, you objected again. As he asked the officer a question, and in addition thereto said if you need to refresh your mind, look at your report. If the officer doesn't have to look at his report, if he knows the answer without looking at it—

"MR. MORROW: Your Honor, the only point now, I should be proceeding; but I think counsel said that it's correct he said these things, we have counsel's affirmation that he said this.

"MR. WEISS: Who said it?

"THE COURT: One at a time. Don't interrupt one another.

"MR. MORROW: Maybe—could we please have read back what counsel said?

"MR. WEISS: He knows what I said. If he wants to go over there and listen to it, that has no materiality or relevancy, and I was explaining my objection to the Court. And that is in the case.

"THE COURT: I realize everyone is talking at one time. Don't both of you talk at one time. I told you about 12 times, and the 13th time will be the last time." And:

"MR. WEISS: I object to him looking— he is inferring—actually, what he is doing is looking—

"MR. MORROW: I never heard the objection yet that I can't look at something.

"MR. WEISS: Object to the form of the question, making a statement, and also writing statements.

"THE COURT: All right. Ask a question. Don't interrupt him until he asks the question, then we will see if you have a logical objection. If you do, make it.

If you don't, don't make it.

"Q (By Mr. Morrow): Okay. Let's get a point for the question.

On July 16th, you saw Mrs. Torell; is that correct?

"MR. WEISS: Well, asked and answered.

"THE COURT: We have got to have a starting point again. This is a starting point. He saw her July 16th. Go ahead.

"Q (By Mr. Morrow): Then you had mentioned that Bobby had done it; is that correct? You have already said that. Is that correct? ·

"MR. WEISS: I object to this repetitious rephrasing. If he said it, he said it. Why, he already said it.

"THE COURT: You are right, he has already said it. He is trying to get the next question off the ground for the last 20 minutes, and you keep objecting. Now he has to go back to the preamble so he can ask a question. Now, ask the question.

"Q (By Mr. Morrow): Is that correct?

"A That's correct.

"Q And it was also correct prior to your saying that she had not been able to identify Bobby Moore—

"MR. WEISS: I am going to object to that as a misstatement, and it should be stricken. She did not say that, and it would be hearsay. And he said that is not correct before. And it's an improper question.

"THE COURT: This is cross examination. I am sure if she did not say that, the officer will say she didn't.

"THE WITNESS: That is very much incorrect.

"Q (By Mr. Morrow): Please direct your attention to the report which we have been discussing, and—do you have your report and the part I am talking about?

"MR. WEISS: He doesn't need the report. Just ask the question.

"THE COURT: If Mr. Morrow wants him to look at the report for the purpose of possibly refreshing his recollection, he may do so. The officer said—

"MR. WEISS: May I ask the witness a question on voir dire to find out?

"MR. MORROW: We were there a half an hour ago.

"THE COURT: All right. If the report will refresh his recollection, you may refer to it and give an answer.

"Q (By Mr. Morrow): Please refer to your report.

"MR. WEISS: I object. If he needs to. He hasn't indicated he needed to. This is a misleading question, improper question as to form.

"THE COURT: He asked him a question; the officer said the question that he asked him was very much incorrect; so now Mr. Morrow has the opportunity to ask the officer to look at his own report made that day to see if it refreshes his recollection to the contrary. It may not.

"MR. WEISS: Wait a minute. He didn't say anything about the contrary.

"THE COURT: That is what he implied.

"MR. WEISS: Let the implication stand."

And:

"Q You recall that now only because Mr. Weiss—let me finish—

"THE COURT: Mr. Weiss, don't break in; let him ask his question. Your breaking in is purely argumentative. We don't want any more arguments. If you have any objections, make them in the proper manner. But you go ahead, Mr. Morrow. You may ask the question.

\* \* \* \* \* \*

"Q Incidentally, it is correct that this person we are talking about would be a boy or a young man, but not generally classified as a man?

"MR. WEISS: Well, I am going to object to that. That is a conclusion, boy or young man, but he is not a man.

"THE COURT: All right. It may call for conclusions. Rephrase the question and let, if you will,—

"Q (By Mr. Morrow): In which category would you want to put the person that walked into the store: A boy, man or young man?

"MR. WEISS: I object, immaterial and irrelevant.

"THE COURT: If she has an impression in her mind, she may answer it. Did you form such an impression at that time?

"THE WITNESS: Young man.

"Q (By Mr. Morrow): If I were to leave out young man and just say boy or man, which of the two categories—

"MR. WEISS: Objection. That is immaterial and irrelevant, and it is argumentative now. She was asked what category she would put him in, and now she is being asked to put him out of the category.

"THE COURT: If she can differentiate now between boy and man, she may do so, if she can form such an impression.

"MR. WEISS: Let me show my continuing objection to being immaterial and irrelevant and argumentative, and misleading.

"Q (By Mr. Morrow): Is it misleading or confusing to you?

"A Yes.

"Q I will withdraw it.

"MR. WEISS: I will object to the remark of counsel and ask the question and the answer—

"MR. MORROW: Your Honor, counsel is repeatedly making comments as I go along.

"MR. WEISS: I am objecting to it.

"THE COURT: Look, gentlemen, from now on, one at a time speak. I don't want more than one at a time speaking. If one of you asks a question that the other disagrees with and feels that it is legal objection, base your objection very distinctly and clearly, and don't argue with one another. So let's go ahead."

The court commented to Mr. Weiss at one time:

"THE COURT: How did you say it, argue with everybody? Now, you have made more arguments this morning than any case I ever heard. In fact, the bailiff kept track of how many objections you made and you made two hundred and forty-eight. * * *"

The reporter's transcript shows that in 490 pages in which defendant's counsel was cross-examining the State's witnesses Mr. Weiss interposed over 850 objections, plus over 200 other interruptions. Mr. Horton Weiss was well aware at the time of this trial that his professionally immature conduct was not proper. The Court of Appeals as early as 1965 discussed Mr. Weiss's conduct:

"* * * The prosecuting attorney was severely admonished by the trial court on several occasions and both counsel were once threatened with a jail sentence if they did not quiet down.

"Annoying as this conduct must have been to all participating in this trial, nevertheless this court does not find that the defendant was prejudiced. It seems seems more likely that the State's case was prejudiced by the over zealousness of its counsel. * * *" State v. Shook, 1 Ariz.App. 458, 461, 404 P.2d 724, 727 (1965).

The Court of Appeals has also stated:

"Questions four and five being interrelated will be dealt with together. Dozens of objections were made by the prosecuting attorney, Mr. Horton Weiss.

The over-zealous tactics of Mr. Weiss are well known to this court and have been the subject of other appeals; Mr. Weiss has also been personally observed by some of the appellate judges when they were on the trial bench. See, State v. Shook, 1 Ariz.App. 458, 404 P.2d 724 (1965); Weiss v. Superior Court, 12 Ariz.App. 527, 472 P.2d 950 (filed July 31, 1970); and State v. Lenahan, 12 Ariz.App. 446, 471 P.2d 748 (filed July 13, 1970). * *" State v. Mercer, 13 Ariz.App. 1, 4, 473 P.2d 803, 806 (1970).

See also Weiss v. Superior Court of Pima County, 106 Ariz. 577, 480 P.2d 3 (1971), in which this court stated, in upholding a finding of the Superior Court that Mr. Horton Weiss was in contempt for misconduct:

> "In Ong Hing v. Thurston, 101 Ariz. 92, 416 P.2d 416 (1966) we defined contempt as '[a]ny act which is calculated to hinder, obstruct or embarrass a court in the administration of justice, or which lessens the dignity or authority of a court. * *' 101 Ariz. at page 98, 416 P.2d at page 422. A careful review of the record in the instant case reveals that there is evidence to support the judge's conclusion that direct contempt was committed on each of the four occasions in question." 106 Ariz. 577 at 581, 480 P.2d 3 at 7.

■ The citizens of this State may expect that when a person is convicted of a crime the verdict of the jury and judgment of the trial court will be upheld if, under the Constitution of the United States and the Constitution and law of the State of Arizona, we are allowed to do so. However, the natural reluctance of the appellate courts of this State to reverse criminal convictions should not be considered a license to ignore the rules of evidence and minimum standards of conduct in the courtroom. The record herein indicates that Mr. Horton Weiss was guilty of the most unprofessional and immature conduct which impeded the orderly reception of evidence, restricted the right of cross-examination by the defendant, and measurably extended the time it took to try the case. Misconduct alone will not cause a reversal, as a new trial should not be granted to punish counsel for his misdeeds, but where the defendant has been denied a fair trial as a result of the actions of counsel, we will reverse.

In the instant case, the conduct of Mr. Weiss was so outrageous and improper that this court is required to reverse and remand the matter for new trial. In doing so, we wish to quote from two early Arizona cases:

> "It is apparent from the above excerpts from the record that the prosecutor manifested unusual zeal and adopted tactics so irregular and improper that the result must have been harmful to the appellant. Whether what was said could have been corrected by the court, if he had been more direct and positive in his rulings, may be questioned. If prosecutors were a little more careful and orderly in the presentation of criminal cases, or if the court would act more promptly in curbing their zeal and anxiety to secure convictions, regardless of the rules of law, it would save this Court the disagreeable duty of reversing after conviction.
>
> \*   \*   \*   \*   \*   \*
>
> "* * * We shall in the future, as in the past, endeavor to uphold judgments of conviction when in conscience it can be done. Counsel, however, must not expect the court to affirm judgments secured by tactics that are unlawful and unfair." Britt v. State, 25 Ariz. 419, 425, 427, 218 P. 981, 983, 984 (1923).

As Chief Justice Dunne of the Arizona Territory Supreme Court stated almost one hundred years ago:

> "Such things may do in love or war, when all things are said to be fair; but life is too short to transact business on such a system in courts of justice." Rush v. French, 1 Ariz. 99, 123, 25 P. 816, 822 (1874).

Reversed and remanded for new trial.

STRUCKMEYER and HOLOHAN, JJ., concur.