569 P.2d 833

**The STATE of Arizona, Appellee,**

v.

**Steven SWINBURNE, Appellant.**

**No. 3473.**

Supreme Court of Arizona,
In Banc.

Sept. 21, 1977.

Bruce E. Babbitt, Atty. Gen., Phoenix by Heather Sigworth, Asst. Atty. Gen., Tucson, for appellee.

Stanton Bloom, Tucson, for appellant.

CAMERON, Chief Justice.

Defendant, Steven Swinburne, was convicted of first degree murder, A.R.S. §§ 13–451, 452 and 453; two counts of kidnapping with serious bodily injury, A.R.S. §§ 13–491 and 492; and burglary while armed, A.R.S. §§ 13–301 and 302. He received concurrent sentences of life imprisonment on the murder and kidnapping charges and not less than ten nor more than fifteen years on the burglary charge. He appeals from his conviction on all counts. We have jurisdiction pursuant to A.R.S. § 13–1711.

The defendant raised some 17 issues for consideration. We believe the answers to the following questions will be dispositive of the appeal.

1. Did the trial court err in restricting the cross-examination of a prosecution witness?
2. Was it error to admit evidence of an assault committed by the defendant some ten days prior to the murder?
3. Should the defendant's pretrial statements have been suppressed?
4. Was it error for the trial court to deny immunity to a defense witness?
5. Did the trial court err in admitting evidence and instructing on the issue of flight?

The following facts are necessary for a resolution of the issues presented. In the early morning hours of 29 May 1974, the body of William Kim Sigsworth was found at a residence located at 1925 North Justin Lane, Tucson, Arizona. There were numerous bruises, cuts and abrasions on the deceased. The cause of death was a single bullet wound in the back. The deceased had been visiting friends in Tucson and was staying at the house on Justin Lane. At the time, Al Reynolds, Roger Johns and Tom Withers were living in the house.

Evidence at trial indicated that the defendant and Carl Gundersen had, for some time, been dealing in marijuana in the Tucson area. Gundersen and his girlfriend, Chris Sterling, had contacts in Mexico who were supplying them with regular shipments. Sterling and Gundersen, however, did not want to "deal" the marijuana themselves and had agreed to allow the defendant to do the selling. Approximately a week and a half prior to the murder, defendant arranged to store a 600 pound shipment at the home of Dale Friess, a friend of his. This arrangement was made at Gundersen's request. While the marijuana was stored at his house, Friess offered to sell some of it to Al Reynolds and Tom Withers. Reynolds and Withers came by and looked at it but declined to purchase any. That evening after half the shipment had been sold, two men wearing ski masks and carrying guns broke into Friess' house, tied him up, and took the remaining 300 pounds of marijuana.

Believing that no one else knew where the marijuana was stored, defendant and Gundersen suspected Reynolds, Withers and their roommate, Roger Johns. They were told that Reynolds, Withers and Johns had "ripped off" dope on other occasions and that upon being confronted they had, on several prior occasions, returned the stolen drugs rather than risk involving the police.

Shortly after dark on 28 May 1974, defendant along with Gundersen, John Crone, Clay Free and John Sanders, drove to the house on Justin Lane. They intended to confront Reynolds, Withers and Johns and recover the marijuana or its value. Defendant had told a friend of his that if necessary he would drive the three of them to Mexico and "force them to dig their own graves until either the marijuana or some

money came up." Parking some distance from the house, they parted and approached it from different sides. Clay Free and John Sanders walked down the alley behind the house while the defendant, Gundersen, and Crone approached from the front.

Testimony as to who entered the house first and as to exactly what occurred inside is conflicting. It would appear, however, that the defendant and Crone entered at approximately the same time followed by Carl Gundersen a few minutes later. When and under what circumstances Free and Sanders entered the house is also unclear. However, it is agreed that they remained inside for only a short period and that their participation was minor.

Al Reynolds and Kim Sigsworth were the only ones home. Gundersen testified that by the time he entered the house, Reynolds and Sigsworth were already lying on the floor and that one of them was bleeding. He testified that defendant and Crone took Reynolds into a bedroom; that defendant kept yelling at Reynolds about the marijuana and that after a few minutes defendant came running out of the bedroom, leaned over Sigsworth and hit him on the head with the gun. Gundersen testified that as he did, the gun went off striking Sigsworth in the back. Crone substantiated this story.

Defendant took the stand and testified to the contrary, that while Crone was in the bedroom, Gundersen had told defendant to go outside and find Free and Sanders. While he was in the backyard looking for the two of them, he heard a muffled shot and when he returned to the house, Sigsworth was "slumped against" Gundersen.

Immediately following the shooting, Gundersen ran from the house to his car and drove away. Crone picked up Reynolds and carried him out to the front yard. At trial, Crone testified that when he put Reynolds down, Reynolds immediately got up and started running. At that point, according to Crone, defendant leveled his gun at Reynolds stating, "we can't have any witnesses", but that before defendant could fire, he, Crone, grabbed the gun away from him. Defendant denied this series of events stating that he had attempted to call the police following the shooting but that the phone line had been cut.

Reynolds awoke the next morning in the alley behind the house. He had been severely beaten and had no recollection of any of the events of the preceding night.

Defendant was initially arrested on 13 August 1974. At that time, he was registered at the Linda Vista Motel under the name of Michael Durham. Bail was posted and defendant was released from custody on 16 September. Subsequently, on the 24th of December 1974, the Court of Appeals ordered that defendant be held without bond pending trial. A bench warrant was issued for defendant's arrest, however, he could not be located and his bond was subsequently forfeited. Some six months later, on 21 June 1975, defendant was taken into custody at the Black Arrow Lodge. He was registered under the name of Mike Wallace.

Trial before a jury was held in January of 1976. From a jury verdict and judgment of guilt, defendant appeals.

## RESTRICTIVE CROSS–EXAMINATION

As indicated, defendant took the stand at trial and admitted his presence at the house on Justin Lane. His defense was directed at establishing that the fatal shot was fired by Carl Gundersen, not by himself. To counter this argument, the State introduced both circumstantial evidence and the direct testimony of Carl Gundersen.

As its only rebuttal witness, the prosecution called Scott Zarnes. Zarnes had known the defendant for about three years. During the months following the murder, defendant contacted Zarnes several times for help. At one point, Zarnes gave him $40 to help pay his bill at the Linda Vista Motel. Zarnes, at the same time, kept the police informed as to the time and content of defendant's telephone calls. At trial Zarnes testified as to some of these calls:

"Q Did Mr. Swinburne, when he had this conversation with you and said he didn't mean to do it, did Mr.

Swinburne tell you that he didn't mean to do it?

"A He said, 'I didn't mean to kill him.'

"Q Did Mr. Swinburne indicate in any manner about how the individual had been killed?

\* \* \* \* \* \*

"A I can't remember him saying how he did it. Although, at that time I was aware of the way the incident had occurred or Kim was killed.

"Q Mr. Zarnes, did you know—did Mr. Swinburne, when you had contact with him on the phone, did he indicate whether or not he had anything in his possession at the time this man Kim was killed?

"A Yes, he did.

"Q What did he say he had in his possession?

"A A pistol.

"Q I cannot hear you. .

"A A pistol. I'm sorry."

Following this extremely damaging testimony, the county attorney asked Zarnes the following questions and received these responses:

"Q Did [Detective] Reyna at the time you gave the statements promise to do anything for you in connection with your giving him the statement?

"A Only that I would not be arrested that day for accessory to murder.

"Q Did there come a point in time, Mr. Zarnes, when you learned that you would not be prosecuted for being an accessory to murder?

"A Yes. Upon receiving the subpoena to testify in this trial when I came to see you."

It is the contention of the defendant that this was not the only promise made to Zarnes in return for his cooperation. When Zarnes first talked to Detective Reyna (prior to defendant's arrest), a presentence investigation was being conducted by authorities in Missouri. The defense sought to establish that Reyna had impliedly promised not to inform the Missouri officials of the events which had occurred in Tucson.

At the hearing held on the State's motion to suppress, Zarnes stated:

"What it involved was I went down and volunteered this information because I wanted to avoid being arrested. I felt that with a presentence investigation going on in St. Louis it would be looked on very unfavorable if I was arrested in Tucson. The presentence investigation was underway when I went down there and I related this to Detective Reyna because I, well, I wanted to avoid being arrested."

Zarnes denied that Reyna had made any promises to him in return for his testimony.

A tape recording was made of this interview. However, portions of this tape were inaudible. The parties agree that the audible portions of the tape revealed the following:

"[Scott Zarnes speaking.] I tell you, Detective Reyna, there is a presentence investigation that's going to start after Labor Day and probably a misdemeanor in St. Louis. If that start out at a felony, then it will be [inaudible]. This is a very grave important to me. I mean, it means my entire future, you know, if this comes out all right. It's that Judge up there."

Detective Reyna responded that he knew of no reason why the authorities in Missouri would be made aware of the events in Tucson; that probation officers are normally a little bit sloppy and probably would not contact the Tucson police, and that they, the Tucson police, were not going to contact the probation officers. The judge sustained the State's pretrial motion to suppress.

█ When, on direct examination, Zarnes testified that no promises had been made to him in exchange for his testimony, defendant again sought to cross-examine him about the statements made by Detective Reyna concerning the authorities in Missouri. The court again refused defendant's request stating:

"The Court is of the opinion that in the context that this was said, that it is not a promise that could come into evidence. It would open up a new collateral matter."

Defendant asserts it was error to restrict his cross-examination of Zarnes in this matter. We agree.

It is apparent that the State's witness had two motives for cooperating with the police. First, he did not want to be arrested as an accessory to the murder. Whether there were facts which justified an arrest on these grounds is not important. The witness believed this was a possibility and neither the police nor the deputy county attorney suggested otherwise. The second motive was the fear that the Tucson authorities would contact his probation officer in St. Louis, and that the crime with which he was charged might be treated as a felony rather than a misdemeanor. Both these possibilities were real fears to Zarnes and constituted reasons for his cooperation and testimony. The fact that this cross-examination might reveal that the witness was guilty of other crimes or misdemeanors is not controlling. In *State v. Torres,* 97 Ariz. 364, 400 P.2d 843 (1965), we said:

"It is well settled in this jurisdiction that a cross-examiner should be given great latitude in his questions which seek to impeach an adverse witness being examined and it is always proper to inquire as to the motive of the adverse witness in testifying and to show any matter which bears on the credibility of that witness. (citations omitted) Cross-examination directed to impeach the credibility of a witness by showing that he has a motive to testify on behalf of the State or against the defendant is generally proper notwithstanding whether such cross-examination also tends to prove that the witness had committed acts in violation of the law which may or may not have resulted in convictions. (citations omitted)" 97 Ariz. at 366, 400 P.2d at 845.

■ Nor does the trial court's belief that the statements by Detective Reyna did not constitute a promise support its ruling. As we stated in *State v. Little,* 87 Ariz. 295, 350 P.2d 756 (1960):

"The witness' belief that his testimony if favorable to the prosecution will result in leniency or favorable treatment in connection with a crime committed by him is evidence of motive despite the fact that the witness' belief is mistaken, unreasonable or, indeed, is not based on any words or conduct of the prosecution. The test is the witness' expectation or hope of a reward, not the actuality of a promise by the State. (citation omitted) And this expectation of favor or leniency need not be related to the same or similar crime for which defendant is then being tried." 87 Ariz. at 302, 350 P.2d at 760.

Here, Zarnes' testimony reveals that he was greatly concerned that the authorities in Missouri not learn of his involvement with the defendant. He feared that if that information came to light it would adversely affect the sentence imposed by the judge in Missouri. Under these circumstances, Detective Reyna's statements certainly raised a hope or expectation within the witness that he would be protected by the Tucson authorities if he cooperated. The trial court's refusal to allow the defendant to cross-examine Zarnes on this issue constituted reversible error. *State v. Figueroa,* 98 Ariz. 146, 402 P.2d 567 (1965); *State v. Little,* supra; *State v. Torres,* supra; *State v. Holden,* 88 Ariz. 43, 352 P.2d 705 (1960).

## OTHER QUESTIONS RAISED

Since the matter will have to be remanded for a new trial, it is not necessary to consider other issues which are not likely to reoccur when the matter is tried again. Some issues, however, appear certain to arise again and we consider those below.

## PRIOR ASSAULT INCIDENT

Defendant urges that the admission of certain evidence showing defendant's participation in the kidnapping assault of Dale Friess some ten days prior to the murder constitutes error.

At trial, Dale Friess testified as to the events which occurred after half the marijuana was stolen. His testimony disclosed that the night of the "rip off" he and the defendant drove to Carl Gundersen's house in St. David, Arizona, to explain what had

happened. There he was accused by the defendant of having participated in the theft. He was taken at gunpoint to a barn, tied up, hit a number of times by the defendant, and told that he would be killed if he did not reveal the location of the marijuana. He was then taken outside, untied and forced to begin digging "his own grave." He was told that he would never see his girlfriend again and that if he didn't confess his involvement "this" would be the last place he would ever see.

Throughout this ordeal, Friess protested his innocence. However, the defendant, whom Friess described as extremely excited and acting "very hyper," refused to believe him. Friess, in an attempt to save his life, told the defendant that he would pay for the stolen marijuana. Defendant refused this offer stating that he wanted the marijuana itself. Although Carl Gundersen was present, according to Friess the defendant was the active participant and did all of the talking.

Ultimately, Friess was told to stop digging and was taken back to the barn. At trial he described what happened next:

"Q When you got back to the barn after having dug, what happened?

"A My hands were tied behind my back again.

"Q By whom?

"A Steven.

"Q Then what happened?

"A Steve proceeded to beat me up.

"Q How did he do that?

"A Just by hitting me with his fist on my head. I curled up like a ball trying to keep him from hitting me, but he just kept hitting me."

After some additional questioning in the barn and another incident outside in which the defendant tripped Friess off a bridge into a shallow irrigation canal, Friess was taken into Gundersen's house. He spent the night in the house with one end of a rope tied to his leg and the other end tied to the defendant in order to prevent any attempt at escape.

The next morning the defendant, Gundersen, and Friess drove to Nogales, Mexico, where Gundersen spoke with his supplier. They then returned to Tucson, where, after collecting all of his assets and borrowing some money from his attorney, Friess paid defendant and Gundersen $12,500. He was told that he would be allowed a few days to come up with the remaining $7,500.

Defendant asserts that the admission of this entire series of events was highly prejudicial. The general rule in Arizona is well established:

" * * * in the prosecution of one accused of a particular offense, evidence showing or tending to show the commission by accused of another crime entirely distinct and independent of that for which he is on trial, even though it be a crime of the same class, is neither relevant nor admissible." *Dorsey v. State,* 25 Ariz. 139, 143, 213 P. 1011, 1012 (1925).

We have repeatedly reaffirmed that rule. *State v. Jaramillo,* 111 Ariz. 2, 522 P.2d 1079 (1974); *State v. Tostado,* 111 Ariz. 98, 523 P.2d 795 (1974); *State v. Moore,* 108 Ariz. 215, 495 P.2d 445 (1972); *State v. Little,* supra.

 Evidence of this nature is excluded in part to avoid confusing the jury and to prevent their attention from being distracted from the real issues of the case. *State v. Hughes,* 102 Ariz. 118, 426 P.2d 386 (1967). In addition, it is feared that such evidence may lead the jury to conclude that the defendant is a "bad man" and as a result convict him on lesser evidence than it would otherwise normally require. *State v. Deschamps,* 105 Ariz. 530, 468 P.2d 383 (1970). There are, however, a number of well-recognized exceptions under which evidence of other crimes or misconduct may be introduced. Under these exceptions, such evidence is admissible to prove motive, intent, absence of mistake or accident, common scheme or plan, and identity. *Dorsey v. State,* supra; *State v. Moore,* supra; *State v. Hardin,* 99 Ariz. 56, 406 P.2d 406 (1965); *State v. Tostado,* supra. Under the facts presented here, the testimony concerning defendant's conduct in trying to recover the stolen marijuana was not error.

Defendant took the stand at trial and admitted his presence at the events at the house on Justin Lane, but he denied any intent to use force, stating that he didn't anticipate that there would be any violence nor did he expect any resistance. The beating of Dale Friess and forcing him to "dig his own grave" occurred approximately ten days prior to the murder while defendant was attempting to recover the same marijuana. Evidence of that incident was probative of the defendant's actual intent upon entering the house on Justin Lane—to recover the marijuana and to use whatever force was necessary to do so. It was admitted to show the jury the entire picture of events surrounding the murder and to establish the defendant's true intent. See *State v. Tostado,* supra. Proof of defendant's intent was a necessary part of the prosecution's case on the burglary charge and was also at issue on the kidnapping charge. The evidence was properly admitted under one of the recognized exceptions to the general rule.

Defendant raises a second objection to the admission of the incident involving Dale Friess. Noting that he was initially charged with kidnapping as a result of that incident and that that charge was subsequently dismissed with prejudice, defendant asserts that under our ruling in *State v. Little,* supra, admission of that evidence was improper. In *Little,* we held that it was error to admit evidence of a prior narcotics sale by the defendant where such sale had been the subject of a criminal action of which the defendant had been acquitted. Defendant's argument is that the prior dismissal with prejudice of the kidnapping charge here, constituted, in effect, an acquittal, therefore precluding the admission of that evidence. Again we do not agree.

The rationale behind our decision in *State v. Little,* supra, was that the defendant's acquittal should relieve him from having to answer, for a second time, evidence which amounts to a charge of a crime of which he has already been acquitted. That rationale is not applicable here. The defendant in the instant case has never been tried, much less acquitted, of the prior offense. Therefore the admission of such evidence in no way places him in the position of having to refute, for a second time, his commission of a prior offense. Annot., 86 A.L.R.2d 1120.

Moreover, in reaching our decision in *State v. Little,* supra, we noted that the admission of evidence of a prior offense depends upon a balancing of the need for its admission against any prejudice that may result. In that case the prior offense was a totally unrelated drug sale. By contrast, the incident involving Dale Friess in this case was integrally related to the charges on which defendant stood trial. Its relevancy to the issues at trial, other than as proof of the defendant's character, outweighed any possible prejudice. We find no error.

## SHOULD THE DEFENDANT'S PRE-TRIAL STATEMENTS HAVE BEEN SUPPRESSED?

Swinburne was arrested 21 June 1975 at the Black Arrow Lodge and was taken to the Pima County Sheriff's Office. During the booking process he talked to his lawyer over the telephone. In the interim before Swinburne's lawyer arrived, Detective Bunting arrived at the Sheriff's Office and was told by Sergeant Jett that the defendant had been advised of his *Miranda* rights upon arrest. Detective Bunting then approached Swinburne and told him that he wasn't going to advise him of his rights because he had been read his rights on many previous occasions. Swinburne agreed that this was true. Detective Bunting then initiated a conversation with Swinburne concerning why Swinburne had not surrendered himself earlier. Swinburne replied that it was because the police were convinced that he was the guilty party. Swinburne then gave an extensive exculpatory statement of the events on Justin Lane on the night of 28 May 1974. Swinburne stated that Gundersen was the triggerman; when the shot was fired he (Swinburne) had just stepped outside the house at Gundersen's order to see if the neighbors had heard

any noises, and when he reentered the house the victim, Sigsworth, was slumped against Gundersen. Swinburne also related that he and Gundersen later returned to the house where Swinburne wiped Gundersen's fingerprints off the front door.

Swinburne repeated this version of the events at trial, but added that Clay Free and John Sanders had accompanied himself, Gundersen and Crone to the house on Justin Lane, and when he, Swinburne, heard the gunshot he was in the backyard looking for Free and Sanders. On cross-examination the following occurred:

"Q Remember Detective Bunting telling you if you had a story to tell or your side of the story that you had a right to tell it?

"A Yes, sir.

"Q Remember telling Detective Bunting that Gundersen was the bad party, not you?

"A Yes, sir, I believe I did.

"Q Do you remember telling Detective Bunting on June 21, 1975, that at the time of the shooting Crone was in another part of the house and you had just stepped outside of the house at Gundersen's direction to see if the neighbors had heard any shouting or hollering?

"A Yes, sir.

"Q You didn't tell Detective Bunting that you stepped outside to see John Sanders or Clay Free, did you?

"A I don't believe I told Detective Bunting that, no. I can't recall the conversation in detail. I might have mentioned it. I can't recall.

"Q You didn't tell Detective Bunting anything at all about Clay Free or John Sanders on June 21?

"A That's right.

* * * * * *

"Q Isn't it true, Mr. Swinburne, you didn't say anything about Clay Free and John Sanders at that time because you didn't know what they had said and you knew you better not say anything because without knowing what they said you might say too much?

"MR. FLYNN: I object, if the Court please. It's been asked and answered. Secondly, its argumentative.

"THE COURT: Overruled.

"THE WITNESS: I did not know at that time that the police even knew about Clay Free or John Sanders. That's why I did not talk to Mr. Bunting about it. I did not want to get them into trouble."

In his closing argument to the jury, the prosecutor stated:

"You heard Mr. Swinburne indicate in his testimony under cross-examination that he hadn't told Sergeant Bunting about Clay Free and John Sanders. I submit the reason he didn't was at that time Mr. Swinburne knew what the State's case was. He'd already manufactured—he had already gotten his story together. He knew what he had to say to avoid what those guys had said. But these were two new elements he hadn't yet contended with and he thought he'd better not say anything about them until he read their statements and then he could tailor his own statement to meet the statements they made to the police officers."

 On appeal, the defendant challenges the admissibility of his post-arrest statements to Detective Bunting, contending that Detective Bunting failed to secure a waiver from the defendant of his *Miranda* rights before speaking to him. The trial court found that Swinburne's statements were voluntary and admissible. We agree. His exculpatory statements were made on his own initiative and were not in response to any questioning or interrogation by the detective. Reliable and trustworthy statements made by the defendant may be admissible for impeachment purposes notwithstanding the fact that *Miranda* warnings were not given at the time the statements were made. The statements were used only to impeach Swinburne on cross-examination. *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *State v. Durham*, 111 Ariz. 19, 523 P.2d 47 (1974).

■ The defendant also asserts that the conversation should have ceased in any event until his attorney arrived at the Sheriff's Office. In *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 510 (1975), the Supreme Court held admissible for impeachment purposes inculpating post-arrest statements of the defendant made after he had been given his *Miranda* rights and exercised his right to request a lawyer, but before he had been furnished with counsel. The court said that evidence which is otherwise inadmissible against the defendant in the prosecution's case in chief is not barred for all purposes, provided that "the trustworthiness of the evidence satisfies legal standards." 420 U.S. at 721, 95 S.Ct. at 1221, 43 L.Ed.2d at 577. There is no evidence in the record that Swinburne's statements to Detective Bunting were coerced or otherwise involuntary. The prosecutor properly attacked Swinburne's credibility by cross-examining him on the inconsistencies between his post-arrest statements and his trial explanation. We find no error.

■ The defendant also asserts that the prosecutor's cross-examination concerning his failure to tell Detective Bunting at the time of his arrest about the presence of Clay Free and John Sanders constituted an impermissible comment on defendant's post-arrest silence, citing *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

In *Doyle v. Ohio,* the Supreme Court held that it is a violation of a defendant's due process rights for a prosecutor to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving his *Miranda* warnings at the time of his arrest. The reason, said the court, is that

"Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. See *United States v. Hale,* 422 U.S. 171, at 177, 95 S.Ct. 2133, at 2137, 45 L.Ed.2d 99,

at 99. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." 426 U.S. at 617–18, 96 S.Ct. at 2244–45, 49 L.Ed.2d at 97–8.

■ Where the accused does not initiate the conversation with law enforcement authorities, but instead responds to several questions and then lapses into silence when asked an embarrassing question, the accused may be exercising his right to remain silent at that point and it is error for a prosecutor to comment on such silence. *State v. O'Dell,* 108 Ariz. 53, 492 P.2d 1160 (1972).

In the instant case, however, Swinburne volunteered his exculpatory story. In response to Detective Bunting's question about the presence of the two other persons at the murder site, Swinburne declared that he did not want to discuss that subject. Swinburne did not at this point reassert his right to remain silent or otherwise affirmatively indicate a desire to end the conversation, but instead continued to tell his side of the story. Under these circumstances we hold that Swinburne's refusal to answer the question was not "silence" within the meaning of *Doyle v. Ohio,* supra, or *State v. O'Dell,* supra. When Swinburne at trial testified about the presence of Clay Free and John Sanders at the murder site, the prosecutor properly impeached this testimony by cross-examining him on his earlier refusal to discuss their presence when he had an opportunity to do so.

## IMMUNITY FOR A DEFENSE WITNESS

Prior to trial, counsel for defendant sought to have immunity from prosecution for harboring a fugitive and accessory to murder granted to Michael Fletcher. Fletcher had apparently helped the defend-

ant after he had skipped bond and was living as a fugitive.

A hearing was held on defendant's motion. Both Fletcher and his attorney were present. Fletcher took the stand and stated that upon the advice of counsel he would not testify. Defendant's motion was taken under advisement and subsequently denied. Fletcher was not called to testify at trial.

On appeal defendant asserts that the trial court's refusal to compel the prosecution to grant immunity to Fletcher, especially in light of the fact that immunity was granted to several prosecution witnesses including Dale Friess, John Sanders and Clay Free, constituted error. We do not agree.

■ In *State v. Buchanan,* 110 Ariz. 285, 518 P.2d 108 (1974), we considered the question of whether our immunity statute, A.R.S. § 13–1804, extended to requests by the defense for immunity from prosecution for defense witnesses. In concluding that due process does not require that immunity be available to defense as well as prosecution witnesses, we stated:

> "The granting of immunity to a witness involves an exercise of discretion in a matter of public policy, i. e., whether the public interest would best be served by exchanging immunity from prosecution for testimony. Absent a clear showing to the contrary, a statutory grant of immunity is limited to the State for purposes of carrying out the legitimate demands of government." 110 Ariz. at 289, 518 P.2d at 112.

In the instant case, no clear showing to the contrary was made. We find no error.

■ Defendant further argues, however, that but for the misconduct of the county attorney, Fletcher would have testified for the defense. At the hearing, Fletcher indicated that he had initially intended to testify for the defendant. However, following a conversation between his attorney and the county attorney in which the latter indicated that if Fletcher testified and incriminated himself for having assisted the defendant while he was a fugitive he would be prosecuted, Fletcher decided not to testify.

While we would not approve of any attempt by the county attorney to intimidate this witness, we do not believe that the county attorney's conduct was responsible for Fletcher's decision not to testify.

At the time, Fletcher was being prosecuted in federal court on another matter. Testimony at the hearing reveals that his attorney advised him not to testify in part because he might incriminate himself in connection with the State proceedings and in part because he might incriminate himself in connection with the proceedings in federal court.

From the testimony we think it evident that Fletcher's decision not to testify was not the result of any undue pressure by the county attorney. Cf. *United States v. Morrison,* 535 F.2d 223 (3rd Cir. 1976). We find no error.

## EVIDENCE OF FLIGHT

Defendant contends that the trial court erred in permitting the prosecution to introduce evidence on the issue of flight and in instructing the jury on that issue. He argues that he never left Pima County between the murder and his arrest and that the issue of flight was therefore not properly a part of the case.

The prosecution did not attempt to prove that the defendant had at any time left the jurisdiction. That fact, however, is not significant.

■ We have consistently held that flight or concealment of an accused is properly admissible in evidence as a fact which may be considered by the jury and from which they may draw an inference, in the absence of any explanation, that the accused is guilty. *State v. Owen,* 94 Ariz. 404, 385 P.2d 700 (1963), rev'd on other grounds, 378 U.S. 574, 84 S.Ct. 1932, 12 L.Ed.2d 1041; *State v. McLain,* 74 Ariz. 132, 245 P.2d 278 (1952); *State v. Guerrero,* 58 Ariz. 421, 120 P.2d 798 (1942).

In *State v. Owen,* supra, we stated the test as follows:

"Ordinarily, unless the flight or attempted flight be open, as upon immediate pursuit, the element of concealment or attempted concealment is considered a necessary component. This obviously flows from the supposition that with a consciousness of guilt, 'the wicked flee when no man pursueth' to avoid punishment." 94 Ariz. at 411, 385 P.2d at 704.

At the time of both arrests, defendant was living in temporary housing under assumed names. When he was first arrested, defendant was registered at the Linda Vista Motel under the name of Michael Durham. Identification in the name of Durham was found in defendant's room. When he was arrested the second time, after having skipped bond and remained a fugitive for six months, defendant was living under the name of Mike Wallace. Additional evidence indicates that defendant either used or intended to use several other aliases and attempted to disguise himself by shaving his beard and dyeing his hair. These activities constitute concealment and support the giving of an instruction on flight. *State v. Ferrari*, 112 Ariz. 324, 541 P.2d 921 (1975); *State v. Brewer*, 110 Ariz. 12, 514 P.2d 1008 (1973).

Nor is it significant that the defendant never left the jurisdiction. In *State v. Owen*, supra, we quoted the following language from *State v. Guerrero*, supra, with approval:

"The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or *it may be a concealment within the jurisdiction.*" (Emphasis added) 94 Ariz. at 411, 385 P.2d at 704. See *State v. Loftis*, 89 Ariz. 403, 363 P.2d 585 (1961).

The facts of this case present a classic example of "concealment within the jurisdiction," and we find no error in the giving of an instruction on the issue of flight.

Defendant also objects to the language of the instruction. The jury was instructed as follows:

"Running away or hiding after a crime has been committed, or failing to appear in court for trial, does not in itself prove guilt.

"However, you may consider any evidence of the defendant's running away, concealment, disguise, denial of identity, change of name and like acts together with all the other evidence as demonstrating a consciousness of guilt."

Specifically, defendant objects to the language which permits the jury to consider evidence of flight as demonstrating a "consciousness of guilt." In support of his position, defendant cites R.A.J.I. Criminal Standard 12, which does not contain the "consciousness of guilt" language.

The words "consciousness of guilt" were taken directly from this court's opinion in *State v. Owen*, supra. In that case, we explained the admissibility of evidence of flight as follows:

"The reason for the rule of admissibility of evidence concerning flight or attempted flight is not that such flight in and of itself is evidence of guilt, but that it is a fact which may be considered by the triers of fact as raising an inference * * that the accused is guilty. (footnote omitted) In other words, it is evidence of conduct which may indicate a consciousness of guilt on the part of the accused." 94 Ariz. at 411, 385 P.2d at 704.

We find no error in the use of that language by the trial court here. See *State v. Ferrari*, supra; *State v. Quila*, 108 Ariz. 488, 502 P.2d 525 (1972).

Reversed and remanded for proceedings consistent with this opinion.

STRUCKMEYER, V. C. J., and HAYS, HOLOHAN and GORDON, JJ., concur.