492 P.2d 1160

**The STATE of Arizona, Appellee,**

**v.**

**Audie O'DELL, Appellant.**

**No. 2257.**

Supreme Court of Arizona,
In Banc.

Jan. 28, 1972.

Gary K. Nelson, Atty. Gen. by William P. Dixon, Asst. Atty. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender by James H. Kemper, Deputy Public Defender, Phoenix, for appellant.

**54**

CAMERON, Vice Chief Justice.

This is an appeal from a jury verdict and judgment of guilty of robbery (§§ 13–641, et seq. A.R.S.) and a five year suspended sentence with incarceration for one year in the Maricopa County Jail (§ 13–1657, subsec. A, par. 1 A.R.S.).

Appellant presents three questions for our determination:

1. Was it error to allow the State to show an "admission by silence" by testimony that the defendant made no response when confronted with a $100 bill he allegedly stole from the victim?

2. Was a statement by one of the State's witnesses admissible as impeaching a prior inconsistent statement of one of defendant's witnesses and, if so, did the court properly instruct the jury in this regard?

3. Did the trial court make an adequate voluntariness finding with regard to statements made by the defendant to the police?

The facts necessary for a determination of this matter are as follows. From about 2:30 to 11 p. m. on 21 July 1970, the victim, Charles Loomis, was drinking in the Golden Eagle Tavern in Phoenix, Arizona. The defendant Audie O'Dell, who was a passing acquaintance of the victim, also was drinking at the Golden Eagle Tavern on the day in question. Between 3 p. m. and 11:00 p. m. the victim and the defendant had two general conversations. In their third conversation, defendant offered to sell the victim several cases of cigarettes, daring the victim to prove that he had enough money to buy the cases. The victim flashed out his three one hundred dollar bills and the defendant asked the victim to come outside to consummate the deal.

It is at this point that there is a divergence as to what happened. According to the victim, the defendant hit him on the head shortly after they walked out of the bar and then robbed him of all his money— three one hundred dollar bills and $84 in other currency. According to defendant the only thing that transpired when he and the victim went outside was that the deal was completed—the defendant transferring the cigarettes to the victim's car and the victim giving the defendant $100.

At 11:55 p. m. on 24 July 1970, three days after the alleged robbery, Police Officer Leo Brunette of the City of Phoenix, accompanied by Detective Robert Week, arrested defendant for the Loomis robbery. Incident to this arrest, Officer Brunette found on defendant a hundred dollar bill, bearing Loomis' signature in red ink.

Officer Brunette read defendant his "Miranda" rights and took him to the City Jail. The following conversation was introduced into evidence over the objections of defendant:

"A [Officer Brunette] We were in jail, in the city jail, and the Defendant was in a small room away from the Booking Room waiting to be photographed and I was called over or—excuse me—the Defendant called me over to him, into this room and without looking at my report, I couldn't give it verbatim or—he said to me, in effect: 'I didn't rob that fat old man', but mentioned he had seen two guys and that he was there and—

\* \* \* \* \* \*

"Q What did you do in reply to this?

"A At that time, I showed him the hundred dollar bill that—

"Q Is that State's Exhibit 1 in evidence?

"A That's correct, the same hundred dollar bill, the one with the victim's name on it. And I said: 'That is the victim's name' and the Defendant, at that time, replied: 'It sure is.' I asked him: 'How do you explain that?' and there was no answer.

"Q He did not reply?

"A No."

The defendant took the stand on his own behalf and testified that when he was asked to explain the hundred dollar bill that he

then thought "it very wise to consult an attorney first." The attorney for the State commented upon this in argument to the jury:

"  *  *  *  The officer said: 'Isn't that Charles Loomus's signature on that bill?' Yes, and O'Dell says: 'Oh, it sure is' and the officer says: 'All right, what is your explanation for it? What is your explanation?' Mr. O'Dell now tells you that he had applied his good reason and decided that was the time to talk to an attorney—of course it was.

"Examine your own state of minds, put yourself in that situation. What would you do? What would reasonable people do? You have a perfect reasonably verifiable explanation. You got it from Charles Loomus when the cigarettes were exchanged, certainly, you, you, you, in fact, anybody on this jury would have done—'Well, I got it from this guy because I sold him the cigarettes'. Would you have contacted your attorney? *  *  *"

Defendant produced several witnesses in his behalf. One, a Mr. Ross Pritt, was a bartender at a tavern near the Golden Eagle at the time. He testified on direct examination that he had seen Loomis drinking heavily and flashing money around earlier in the day. He also testified that he came across Loomis and two or three officers outside the Golden Eagle an hour or two after the alleged robbery took place. He stated (and this is uncontradicted) that he and an officer examined Loomis' head and found no signs of a wound or bruise. On cross-examination he testified as follows:

"Q Isn't it a fact, Mr. Pritt, that the Defendant came to you and advised you that he had hit and robbed Charlie Loomus at the bar the other night and that Gil, his brother, was with him when he did it?

"A No, sir.

"Q He never said that to you?

"A He didn't.

"Q Did you ever tell Officer Brunette that that was a fact?

"A No, sir.

"Q You never told him that?

"A No, sir.

"Q Call your attention to the 24th of July, 1970, 10:00 p. m.—you will admit the Officer talked to you at that time?

"A Somewhere around that time."

For impeachment purposes, the Deputy County Attorney put Officer Brunette back on the stand and, over defense objection, he was allowed to testify as follows:

"Q Did you have a conversation with Ross Pritt concerning something that he had or that Mike Evans [the defendant]—person known as Mike Evans—had said to him?

"A Yes, I did.

*  *  *  *  *  *

"Q What did he tell you?

*  *  *  *  *  *

"A He told me that the fellow known to him as Mike Evans told him that he and his brother, Gilbert, had hit and robbed Charlie at the Golden Eagle Bar. This is not verbatim, but this is what I was advised of."

## ADMISSION BY SILENCE

█ It is clear that admissions by silence can violate the Fifth Amendment privilege against self-incrimination. The federal courts have stated:

"  *  *  *  after the arrest and during an official examination, while respondent is in custody, it is common knowledge that he has a right to say nothing. Only under peculiar circumstances can there seem to be any duty then to speak. Lacking such circumstances, to draw a derogatory inference from mere silence is to compel the respondent to testify; *  *." McCarthy v. United States, 25 F.2d 298, 299 (6th Cir. 1928). United States v. Pearson, 344 F.2d 430, 431 (6th Cir. 1965). See also People v. Cockrell, 63 Cal.2d 659, 47 Cal.Rptr. 788, 408 P.2d 116 (1965).

And this has been the law in Arizona:

"We agree and do not approve the introduction of evidence of an accused's silence in reply to questions when he is in custody or under other circumstances where it is his constitutional right to refrain from incriminating himself under the Fifth Amendment to the Constitution of the United States. * * *." State v. Simoneau, 98 Ariz. 2, 6, 401 P.2d 404, 407 (1965). See State v. Thomas, 104 Ariz. 408, 454 P.2d 153 (1969); State v. Villalobos, 6 Ariz.App. 144, 430 P.2d 723 (1967).

Although most courts seem to base their exclusion of "admissions by silence" in criminal cases on Fifth Amendment grounds, there are, we believe, persuasive evidentiary reasons for exclusions of this kind:

"'* * * Nothing can be more dangerous than this kind of evidence; it should always be received with caution, and never ought to be, unless the evidence is of direct declarations of that kind, which naturally calls for contradiction * * * Of all evidence, loose, hasty conversation is entitled to the least weight.' [Moore v. Smith, 14 Serg. & R. 388]." Commonwealth v. Dravecz, 424 Pa. 582, 227 A.2d 904, 908 (1967).

The State, however, contends that: "Silence occurring in the midst of an argumentative discussion is not an admission by silence. It is rather a form of communication which can be testified to as if it were spoken." The State's argument is that the defendant had waived his right to remain silent by initiating the conversation with Officer Brunette and that by his silence he was not re-asserting his right to remain silent, but was tacitly admitting that he couldn't explain away the one hundred dollar bill.

There is authority for admitting the evidence because of the peculiar circumstances, in this case, where a defendant, in custody and after being informed if his right to remain silent, voluntarily initiates a conversation attempting to exculpate himself:

"There was no error in allowing the deputy sheriff Cooper to testify that when defendant told the Solicitor, shortly after the homicide, that deceased had stabbed him three times on the back of his shoulder, the Solicitor asked: 'Do you mean that this boy Fred Ridley * * * cut or stabbed you on the left shoulder there after you shot the last time?' and that defendant made no reply to this question. * * *." Pope v. State, 39 Ala.App. 42, 96 So.2d 441, 445–446 (1957).

Whether a case in which the accused does not initiate the conversation, but responds to several questions, then lapses into silence when asked an embarrassing question falls into the same category is much more doubtful. In such a case it generally would not be as "natural" that the accused respond to an embarrassing question. It is much more likely that he is simply asserting his right to remain silent. Thus we limit our holding that an admission by silence can be admissible evidence to the facts of the case before us. It is noted also that defendant contended that he received the one hundred dollar bill as a result of the sale of the cigarettes and not by robbery. If the jury had chosen to believe him then the possession of the bill would not be damaging and the defendant's reason for not answering may have been more persuasive.

## WAS A STATEMENT BY ONE OF THE STATE'S WITNESSES INADMISSIBLE AS HEARSAY-UPON-HEARSAY?

Defendant put a witness, Pritt, on the stand and on cross-examination Pritt was asked if he had told Officer Brunette that the defendant had told him that the defendant had committed the robbery. Pritt denied telling Officer Brunette this, so the State, for purposes of impeaching Pritt by a prior inconsistent statement, put Officer Brunette on the stand and asked him if he was told by Pritt that defendant had admitted the crime to Pritt. Officer Brunette said that he had been told this by Pritt. The testimony of Brunette and Pritt is reproduced, supra.

As to the defendant and the truth of what was said, Officer Brunette's testimony is hearsay-upon-hearsay. He is relating what Pritt told him the defendant told Pritt. Had Pritt so testified what the defendant allegedly told Pritt it would fall under the admission against interest exception to the hearsay rule. The State contends, moreover, that what Pritt allegedly told Officer Brunette is a prior inconsistent statement, usable for impeachment purposes as to Pritt. McCormick, Handbook of the Law of Evidence, Hornbook Series, § 39, p. 75. With this we agree:

> "When evidence of a prior inconsistent statement is offered and received into evidence for impeachment of a witness on the stand there has been leniency with regard to hearsay rules to the extent that it need not be admissible as independent evidence. Indian Fred v. State, 36 Ariz. 48, 282 P. 930 (1929); Welch v. Medlock, 79 Ariz. 247, 286 P.2d 756 (1955)." State v. Favors, 92 Ariz. 147, 150, 375 P.2d 260, 261 (1962).

There is a problem which, though not raised in defendant's brief, the State has candidly admitted. Assuming that Officer Brunette's testimony is admissible only to impeach the witness Pritt by showing a prior inconsistent statement, was the jury properly instructed regarding the testimony?

The defendant tendered as a jury instruction CALJIC 2.13:

> "Evidence that on some former occasion a witness who is not a party to this action made a statement or statements that were inconsistent with his testimony in this trial may be considered by you only for the limited purpose of testing the credibility of the witness. Testimony of such inconsistent statements must not be considered by you as evidence of the truth of the facts as stated by the witnesses on such former occasion."

The court refused to give CALJIC 2.13, relying on MARJI No. 5 as covering the issue. MARJI No. 5 reads:

> "You are the sole judges of the credibility of the witnesses and of the weight to be given to the testimony of each of them. In determining the weight to be given to the testimony of any witness you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any motive, interest, bias or prejudice he may have and the credibility of his testimony considered in the light of all the evidence in the case."

The Arizona rule is clear that " * * * instruction by the court to the jury that evidence such as this statement is to be considered not as evidence bearing upon the guilt of the defendant but only upon the credibility of the witness testifying is required." State v. Favors, supra, 92 Ariz. at 150, 375 P.2d at 262. In Welch v. Medlock, 79 Ariz. 247, 250, 286 P.2d 756, 758-759 (1955) we stated: " * * * when a document is admitted solely for impeachment purposes the court should by an appropriate admonition tell the jury that it is being admitted for this limited purpose." The instructions given by the trial judge did not make this clear and on remand a more adequate instruction should be given. This matter was properly presented to the trial court and even though not raised by defendant on appeal we must review the record for fundamental error. § 13-1715 A.R.S. The failure to give a cautionary instruction in this case was both fundamental and prejudicial and the matter must be remanded for new trial.

### DID THE TRIAL COURT MAKE AN ADEQUATE VOLUNTARINESS FINDING?

At the very outset of the trial, a hearing was held in the judge's chambers on the subject of the voluntariness of certain statements made by the defendant to Officer Brunette. After Officer Brunette had testified and undergone cross-examination, the judge made the following

**58**

ruling: "Then I'll admit it." We have stated:

> "This procedure is not in accord with the due process requirements of the 14th Amendment. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 953 (1963); State v. Gallagher, 97 Ariz. 1, 396 P.2d 241 (1964); State v. Owen, 96 Ariz. 274, 394 P.2d 206 (1964). At the conclusion of the hearing on voluntariness, the judge must make a definite determination whether the purported confession was voluntary or involuntary. Only if he makes a definite determination it was voluntary may he admit it for consideration by the jury." State v. Costello, 97 Ariz. 220, 222, 399 P.2d 119, 120 (1965).

Upon remand this case must be followed if the matter is raised again.

Reversed and remanded for new trial.

HAYS, C. J., and LOCKWOOD, STRUCKMEYER and HOLOHAN, JJ., concur.