658 P.2d 194

**The STATE of Arizona, Appellee,**

v.

**Lawrence Douglas HOWLAND, Appellant.**

**No. 2 CA–CR 2343.**

Court of Appeals of Arizona, Division 2.

Sept. 21, 1982.

Rehearing Denied Nov. 17, 1982.

Review Denied Dec. 21, 1982.

---

Robert K. Corbin, Atty. Gen. by Bruce M. Ferg, Asst. Atty. Gen., Tucson, for appellee.

Frederic J. Dardis, Pima County Public Defender by Frank P. Leto, Asst. Public Defender, Tucson, for appellant.

## OPINION

HOWARD, Chief Judge.

Appellant was found guilty by a jury of three counts of kidnapping (A.R.S. § 13–1304); two counts of child molestation (A.R.S. § 13–1410); one count of aggravated assault (A.R.S. § 13–1204) and one count of attempted child molestation (A.R.S. §§ 13–1001 and 13–1410). Under A.R.S. § 13–604(H), convictions not committed on the same occasions were treated as prior convictions for enhancement purposes and the defendant was sentenced to a total of 42 years in prison. He contends the trial court erred in (1) not suppressing his confession; (2) admitting evidence of conversations had, and tape recordings made, by him in the course of his treatment by a psychologist; (3) in not rejecting the

M'Naghten test; (4) in commenting on the evidence; (5) in denying his right to be present during certain court proceedings, and (6) in placing unreasonable conditions on his right to testify. We affirm.

Two previous incidents of child molestation on the south side of Tucson led the police to be on the lookout for appellant and his vehicle. On December 3, 1979, appellant was spotted in his car traveling on the Nogales Highway. There was a little girl in the car. He was stopped by the police and it was discovered that the girl, age 8, had been enticed into the car by appellant who told her that her mother wanted him to take her to a convenience market. One of the officers who made the stop told appellant that they were investigating incidents of child molestation and advised appellant of his *Miranda* rights. He asked appellant if he understood these rights and appellant said that he did and that he would talk to the police. The officer asked appellant to remove his shirt and it was observed that he had tattoos on his chest which had been described by previous victims.

Appellant was transported to the police station where he gave a tape-recorded statement which was later reduced to writing. The written statement reveals that appellant was again advised of his *Miranda* rights prior to discussing the crimes. He was asked if he understood these rights and he said that he did. When he was asked if he would answer the officer's questions, he said he would if he could first ask the officer some questions. He wanted to know what was going to happen to him and the officer and he discussed the possible charges and penalties. Appellant then proceeded to confess to all the crimes of which he was subsequently convicted. He also stated that he was on probation in Pima County on a heroin conviction and that he had been convicted in Wisconsin many times for child molestation.

At the motion to suppress, appellant stated that he did not believe he was coerced in any way to answer the questions, but that he did not remember being told about his right to a lawyer and that he believed he would not be appointed counsel until he was taken to court. The trial court found, beyond a reasonable doubt:

"... the defendant was advised of his constitutional rights, and that he understood those rights and that he waived the rights knowingly and voluntarily."

Appellant's defense at trial was insanity and his lawyer admitted in his opening statement that appellant committed the acts with which he was charged.

Dr. Harrison Baker, a psychiatrist and clinical director for the reception and treatment center for the Department of Corrections, testified that appellant was admitted to the center prior to trial for a total of approximately two and one-half months. He interviewed appellant seven times and had occasion to observe him and his behavior and interaction with the other inmates on the ward on approximately 44 separate occasions. Dr. Baker believed that appellant was trying to create impressions of mental illness when none existed. His diagnosis was malingering and pedophilia, a sexual attraction towards children. He also believed that appellant might try to manipulate or disrupt the judicial process. It was further his opinion that appellant was not insane under the M'Naghten test.

Another psychiatrist, Dr. LaWall, testifying for the state, stated that he interviewed appellant three times. He also believed appellant was a malingerer and pedophiliac, and not suffering from any mental illness.

A psychiatrist testifying for the defense, Dr. Gurland, stated that he had examined appellant and that he had a "compulsive neurosis" but was not insane under the M'Naghten test.

Two clinical psychologists examined appellant and testified on his behalf. One found him to be a paranoid schizophrenic in remission and also found that he was not insane under Arizona law. The other also diagnosed paranoid schizophrenia but believed that appellant was insane under Arizona law.

Also testifying for the state was Ralph Wetmore who had a master's degree in

psychology. He was not certified as a psychologist pursuant to A.R.S. § 32–2071, et seq. He testified that appellant and his wife were referred to him by the probation department for marriage counseling. This was prior to the time of appellant's arrest for the offense for which he was convicted. Prior to the commencement of counseling, Wetmore told appellant and his wife that any communications concerning crimes being committed were not confidential.

Wetmore told the jury about his sessions with appellant. These sessions concerned appellant's past sex crimes. Wetmore also testified that there came a point in time where Wetmore offered to help appellant with his child molestation problem for a fee of $1 in exchange for appellant consenting to Wetmore's use of him as a research subject. Wetmore told appellant that if he were a research subject his name would not be used. Appellant agreed and Wetmore asked him to provide him with a tape-recorded autobiography. Wetmore also asked appellant to record how he managed to control his impulses and what kinds of things helped him to stay away from child molestation. Although the record shows appellant was engaged in molesting children in Tucson at the time of his sessions with Wetmore, appellant told Wetmore that it had been five or six years since he had molested any children and he described to him how well he had managed his impulses with three little girls who had come over to his trailer.

Wetmore visited appellant in jail after his arrest for the instant offenses. According to Wetmore appellant knew exactly what he had done. The second time that Wetmore visited appellant in jail, he was told by appellant, for the first time, that maybe he was possessed by a demon and maybe he was not responsible for his acts because of this demon possession. Wetmore told appellant that he was not going to visit him anymore if he persisted with this nonsense about demons. Wetmore described appellant as intelligent and "very quick thinking." Appellant told Wetmore that he was very good at outwitting the psychiatrists and getting them to "play his game."

In conclusion, Wetmore testified that appellant was suffering from pedophilia but that he was not psychotic and was always responsible for what he was doing.

Appellant's tape recording which he had made for Wetmore was reduced to writing and introduced into evidence over appellant's objection. It starts out:

> "Born in 1939. At the time of this recording I am almost 41 years old.
>
> During the past 20 odd years of my life, I spent much of my time in prison, hospital for the criminally insane, a civil hospital for the insane, county jails. 99% of this time I've done has been for sexual perversion."

This opening was followed by five pages detailing perverted sexual conduct which appellant engaged in as a child.

## THE VOLUNTARINESS OF THE CONFESSION

■ Appellant contends that his taped confession should have been suppressed because the officer who took it merely read appellant his Miranda rights and never explained them. We do not agree. There is no requirement that police give the accused a written or oral examination in order to determine whether he understands his rights. Appellant said he understood them and the police have a right to rely on his statement. At the motion to suppress, appellant said he did not understand his right to have an attorney present during interrogation. However, the transcript of the tape recording shows he was clearly told that he did have such a right and that he understood it. Furthermore, appellant is not new to the criminal justice system. He was on probation on a heroin conviction at the time of his arrest. His previous convictions for child molestation and other offenses are numerous. This experience can be considered by the court in determining whether he knowingly and voluntarily waived his rights. See *State v. Vangen*, 72 Wash.2d 548, 433 P.2d 691 (1967).

Appellant also contends his statements were involuntary because of the psychologi-

cally coercive atmosphere, the sympathy of the officers, his mental state (he cried) and the chase which led to his arrest. This contention is totally devoid of merit. The person in the best position to testify as to the involuntariness of the confession was appellant himself. He did so and said that he was not coerced in any way to answer the questions.

Appellant further contends the trial court erred in admitting his confession into evidence because, although it found he knowingly and voluntarily waived his rights, it did not find the confession was voluntary. We do not agree.

■ At the conclusion of the hearing on voluntariness, the judge must make a definite determination whether the statement or confession was voluntary or involuntary and it is only when the court makes a definite determination that the confession or statement was voluntary that it may be admitted and considered by the jury. *State v. O'Dell,* 108 Ariz. 53, 492 P.2d 1160 (1972).

■ A finding of voluntariness was implicit in the trial court's finding that appellant knowingly and voluntarily waived his rights. Cf. *State v. Roberti,* 293 Or. 59, 644 P.2d 1104 (1982). Furthermore, we note here that defense counsel did not object to the form of the finding by the trial court.

## THE TESTIMONY OF WETMORE AND THE TAPE OF PERSONAL HISTORY

■ Appellant contends that the testimony of Wetmore was privileged under the doctor-patient privilege and under Rule 501 of the Arizona Rules of Evidence. He is wrong on both scores. A.R.S. § 13–4062(4) applies only to physicians and surgeons and not to psychologists. Rule 501 states:

"Except as otherwise required by the Constitution of the United States, the Constitution of Arizona, or by applicable statute or rule, privilege shall be governed by principles of the common law as they may be interpreted in the light of reason and experience, or as they have been held to apply in former decisions."

Appellant suggests that we use the foregoing rule to fashion a psychologist-client privilege. We need not do so. The legislature already has. A.R.S. § 32–2085 states:

"The confidential relations and communications between a psychologist *certified as provided in this chapter* . . . and his client are placed on the same basis as those provided by law between attorney and client. Unless the client has waived the psychologist-client privilege in writing or in court testimony, a psychologist shall not be required to divulge, nor shall he voluntarily divulge, information which he received by reason of the confidential nature of his practice as a psychologist, . . ." (Emphasis added)

■ In order to be certified under the chapter the psychologist must, inter alia, have a doctorate degree. Since Wetmore did not have a doctorate degree, communications made by appellant to Wetmore were not confidential. As for the right of privacy, a similar argument was made in the case of *Allred v. State,* 554 P.2d 411 (Alaska 1976). There, the court rejected the privacy argument stating:

"Allred argues that the federal and Alaska constitutions require an evidentiary psychotherapist privilege resulting from the right to privacy, citing *Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678 [1681], 14 L.Ed.2d 510 (1965), and *In re Lifschutz,* 2 Cal.3d 415, 85 Cal.Rptr. 829, 467 P.2d 557, 567–68 (1970). See Note, *Psychotherapy and Griswold: Is Confidence a Privilege or a Right?* 3 Conn.L.Rev. 599, 604 (1971). Since it is apparent that Mrs. Henderson was not a police agent, we do not perceive any state action that would trigger the constitutional privacy guarantees, unlike the situation in *Leyra v. Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954)." 554 P.2d at 416.

Although police action was involved here in the seizure of the tapes made by appellant, their introduction into evidence was harmless beyond a reasonable doubt, *State v. McVay,* 127 Ariz. 450, 622 P.2d 9 (1980), because all that the tapes showed was that appellant engaged in extreme aberrational

sexual behavior, which was readily admitted by appellant at trial and was never in dispute.

## THE M'NAGHTEN TEST

Appellant contends the trial court erred in rejecting his instruction on insanity which was based upon the Model Penal Code § 4.01 and he argued further that the M'Naghten test is unconstitutional. We do not agree. We follow the M'Naghten test and the rule of the Model Penal Code has been specifically rejected in Arizona in the case of *State v. Schantz,* 98 Ariz. 200, 403 P.2d 521 (1965). Furthermore, the court in *State v. Steelman,* 120 Ariz. 301, 585 P.2d 1213 (1978) held the M'Naghten test to be constitutional.

## COMMENTING ON THE EVIDENCE

Appellant complains that an instruction given by the court constitutes a comment on the evidence. Had the court, in fact, given the instruction complained of, it would indeed have been a comment on the evidence. However, it did not give the instruction, as set forth in the original transcript. The record shows that the trial court did not comment on the evidence but that the error occurred when the transcription of the notes was made by the transcriber working for the court reporter. The record having been corrected, it is clear that the instructions given were proper.

## ABSENCE DURING TRIAL

During the trial the following took place:

"THE COURT: Let the record show the jury is entirely withdrawn from the courtroom. It's my understanding that Mr. Howland asks that you request he be excused from the courtroom during the testimony of Rachel Salazar?[1]

MR. RAMAGE–WHITE: Yes.

MISS PEASLEY: That's correct, your Honor.

MR. RAMAGE–WHITE: Because he is upset and afraid that he might not— afraid he could not sit through the testimony. He is afraid he would lose control, and the demon would take over.

. . . . .

MISS PEASLEY: May we approach the bench, your Honor?

THE COURT: Yes.

(There is a discussion)

THE COURT: Mr. Howland asked he be excused from the courtroom during the testimony of the next witness. I have indicated he could be excused from the courtroom. It would be under the same stipulation that I excused him from the courtroom before, the same would apply to this next witness that the witness would identify him as being the person that she was referring to during the testimony of the incident. Who is it?

. . . . .

MR. RAMAGE–WHITE: At this time Mr. Howland informs me he would waive his presence.

THE COURT: It's going to be Detective Coleman [sic]?

MISS PEASLEY: A tape recording of the statement.

THE COURT: You don't want to be here while he is testifying and the tape being played?

MR. HOWLAND: No.

MISS PEASLEY: How about identification?

THE COURT: I assume any time I excused him from the courtroom you're stipulating the witness will identify the defendant here in court that he had conversations and took the statement?

MR. RAMAGE–WHITE: Detective Kohlman, yes, I will so stipulate.

THE COURT: Show at the request of the defendant he be permitted to leave the courtroom during that testimony, and there being no objection, it's ordered granted.

Now, that will take the rest of the afternoon. I think that same witness will be testifying the rest of this afternoon's session. You don't want to be here, you just as soon go on back to jail?

---

1. One of the young victims.

MR. HOWLAND: Yes.

\* \* \* \* \* \*

THE COURT: Is Mr. Howland coming in?

MR. RAMAGE–WHITE: No, sir, your Honor, he is waiving his presence today.

THE COURT: All day?

MR. RAMAGE–WHITE: All day, he is going back to jail. I have some legal matters to take up with the court.

THE COURT: Show that the defendant requested that he be permitted to be absent during all of today's testimony, and that he will waive any issue of identity with respect to any of the witnesses testifying today.

\* \* \* \* \* \*

THE COURT: I thought the record should show before we start back up with the jury, and before the final arguments started this morning, that the defendant was brought from the jail and was returned to the jail when the deputies understood he was not needed in court. And in order to determine completely whether the defendant intended to waive his attendance during final arguments, as well as during testimony, the defendant was telephoned at the jail and his attorney talked to him and the attorney told the court that the session could begin without the presence of the defendant.

Is that agreeable with you to state it that way?

MR. RAMAGE–WHITE: My memory, your Honor, is I told the court Mr. Howland had—

THE COURT: I can tell you exactly what you said, because I was paying close attention at the time.

MR. RAMAGE–WHITE: I think you stated it correctly, but there is another part.

THE COURT: Show that Mr. Ramage-White talked to the defendant from the court's chambers, and that after the conversation Mr. Ramage-White stated to the court [that] he asked the defendant, Larry Howland, did you intend to be present during the arguments, or did you want to be excused from the remainder of the trial. And the defendant stated, I don't know what you're talking about. And the conversation ended at that.

MR. RAMAGE–WHITE: That's correct, your Honor. Essentially correct, your memory is more specific than mine.

THE COURT: If you want to state it differently, go ahead.

MR. RAMAGE–WHITE: No, I think that's what happened.

THE COURT: The court then permitted the defendant, in accordance with the defendant's prior request, to remain out of the courtroom during jury arguments. I believe that's it."

 It is firmly established that one of the most basic of rights guaranteed by the confrontation clause is the accused's right to be present in the courtroom at every stage of his trial. *State v. Armenta,* 112 Ariz. 352, 541 P.2d 1154 (1975). A defendant may, however, waive his right to be present. *State v. Armenta,* supra. In order to find a waiver it must be shown that the defendant had personal notice of the proceeding, and he was aware he had a right to attend and that he had been informed that the proceeding would go forward in his absence should he fail to appear. The record is crystal clear in this case that the requirements of *Armenta* have been met. Appellant cannot walk out during the trial, inform. his counsel that he will not be present, and then claim that his constitutional right to be present has been violated.

Appellant also contends that the trial court erred in not making specific findings at the trial that appellant was competent to waive his right to his presence at the various trial proceedings which we have just mentioned. We do not agree.

 The court's indulge in every reasonable presumption against the waiver of fundamental constitutional rights. A determination of the question of an intelligent waiver depends upon the particular facts and circumstances of the case, including the background, experience and conduct of the accused. A mentally incompetent defend-

ant cannot knowingly or intelligently waive his rights. *State v. Evans,* 125 Ariz. 401, 610 P.2d 35 (1980). In any determination of whether there has been a competent waiver of constitutional rights, the better practice would be for the trial judge to make specific findings, but if the record is adequate, the absence of the specific findings is not reversible error. *State v. Evans,* supra.

■ The record discloses a defendant who is attempting to manipulate the judicial process. He was examined by Dr. La-Wall on February 8, 1980. Dr. LaWall stated:

"It is my impression that this man is suffering from some degree of reactive depression at this time. However, he is also a rather manipulative individual and it is difficult to rule out the possibility of malingering. While he is difficult to interview and is not willing to reveal details about certain aspects of his behavior, it is my impression that this is a matter of choice on his part. I believe he understands the nature of the proceedings against him and can reasonably assist counsel in the preparation of his defense."

He was also at that time evaluated by Dr. Gurland. Dr. Gurland noted that he was married to a woman who apparently is quite occupied with exorcism and other spiritual-like experiences which apparently have been painful and agonizing to him. But he states:

"In answer to questions pertaining to Rule 11.1, it is this examiner's opinion that Mr. Howland is competent to stand trial and that he understands the nature of the proceedings against him and is able to assist his counsel in his own defense."

In June 1980, there was another Rule 11 examination. At that time Dr. Gurland stated:

"At this time Mr. Howland seems to be preoccupied with the feeling of being under demonic powers and feels that if he says anything or does anything that the demons do not wish him to do, that he will cause bodily harm to himself or his wife.

. . . . . .

It is my opinion that Mr. Howland is incompetent to stand trial and that he is so preoccupied with this demonic power that he is unable to aid in his own defense."

Dr. LaWall also re-evaluated the appellant in June. Dr. LaWall notes that appellant states that he does not trust his attorney and does not trust any attorneys available in Pima County and he believes that if he discusses his case with anyone, he will come to some harm at the hands of a demon. Dr. LaWall was of the opinion, inter alia, that appellant either believed that he was possessed by a demon or else he was a malingerer. He stated:

"In my opinion, the defendant is not strictly incompetent in that he is knowingly and willingly refusing to assist counsel. This refusal is based on a belief that negative consequences may occur as a result of such assistance. In my opinion, the origins of his belief are not dillusional. In other words, while he may be misinformed, he sincerely believes in demonology and is not mentally ill. He also may be malingering which is not a mental illness.

Assuming that his beliefs are genuine, in my opinion he is too preoccupied to adequately represent himself."

The old "demon possession" gambit worked and the court ordered that he be committed to the state hospital. This appellant, who had been adjudged not able to assist his attorney in his own defense, then drafted a motion and sent a letter to the court, which he backed up with the citations of legal authority and in which he requested that either he be released or that he be sent to a "civil" hospital. His motion was denied by the trial court and he was sent to the Arizona State Hospital. There he was examined by Dr. Harrison Baker. Appellant was subsequently discharged from the hospital and a third Rule 11 hearing was held. Dr. LaWall stated in his examination:

" * * *

During my first evaluation with Mr. Howland, I found him competent and felt that any difficulty he might have relating to counsel was purely voluntary on his part and not the product of a profound mental disorder. During his evaluation in June, Mr. Howland avowed that he was possessed by a demon and went on at great length about this. He had also made a reference to this during his psychological evaluations, both of which occurred in April of this year. As outlined in my report of June 12, 1980, there was a number of possibilities regarding Mr. Howland's mental state based on his assertion that he was possessed. In my opinion, the most likely of the four I outlined were that he believed he was possessed although was not psychotic or that he was malingering and essentially fabricating the whole story with or without the help of others.

In reviewing the report of Dr. Harrison Baker of the Alhambra Unit at the State Hospital, it is quite clear that Mr. Howland was malingering. Throughout his stay there he indulged in various sorts of histrionic behavior apparently designed to get the attention of the staff and patently designed for effect. It was apparently learned through the report of a 'snitch' that Mr. Howland had stated to certain individuals that he was attempting to appear to be 'crazy' in order to delay his prosecution. At the same time he was apparently involved in a considerable amount of legal work obtained while he was at the Alhambra Unit and certain materials relating to the possibility that he was trying to fake mental illness and some legal materials were discovered.

On mental status today, Mr. Howland appeared as before. He is a large, somewhat obese, bearded man who moves slowly. He sat quietly in the chair, refusing for the most part to make eye contact with the examiner or to respond the questioning. His lack of responsiveness which was quite profound was incongruent with his ability to orient himself to the office setting, to move around quickly and in the right direction and so forth. In other words, he was acting as if he was in a practically vegetative state in response to the examiner but on the other hand was perfectly capable of carrying on activities not clearly related to evaluating his mental state.

* * * * * *

It is my opinion at the present time that Mr. Howland understands the nature of the proceedings against him quite well. His efforts on his own behalf in terms of preparing motions and the like speak eloquently to this point. It is also my opinion that his ability to assist his attorney in preparing a defense is quite intact. I believe that he may be unwilling to cooperate with his attorney in the hopes that his continued protrayal [sic] of himself as a mentally ill person will delay his prosecution further in spite of the evidence to the contrary.
* * * "

Dr. Gurland in his last evaluation stated:

"Throughout the interview session, Mr. Howland sat in the chair in almost a trance-like state and would speak in a very soft voice.... When I further asked him if he was not answering my questions because of his fears of demons harming his wife, he became very frightened and began to become even more tearful.
* * * "

Dr. Gurland found that he was still incompetent to stand trial. However, the trial court disagreed.

There was no indication of any mental deterioration or incompetency during the trial. Instead, the trial shows that appellant, as predicted by Dr. Baker, was doing everything that he could to cause problems. On one day of the trial he was involved in a confrontation with the judge about the way he could consult with a minister before he would testify in his own behalf. The next day the following record was made:

"THE COURT: Let the record show that the jury is entirely withdrawn from the courtroom.

The record may show that after the defendant left the courtroom yesterday afternoon, and was being taken by the deputy through the hallway, that the defendant stated for the bailiff, where the bailiff could hear it, 'Well, I got your judge now, he just committed reversible error.'"

The record does not show that appellant was incompetent to stand trial.

## UNREASONABLE CONDITIONS ON THE RIGHT TO TESTIFY

 During the defense's case, appellant requested that he be allowed to talk to his pastor in the holding cell of the courthouse out of the presence of the attorneys, court officials and others. The court agreed to allow appellant to consult with his pastor in open court, and in private, but refused to allow the consultation to occur in the holding cell. Appellant had the opportunity to talk to his pastor the previous day at the hospital, and also in the courtroom during a recess. The trial court, in denying appellant's request, stated, inter alia, "... it's time that somebody brings to Mr. Howland's attention that he's not going to keep running things around here. He's not in charge, and evidently we have catered to him so long, he thinks that he's supposed to be the one to direct this."

Appellant contends that the trial judge placed an unreasonable condition on appellant's request to consult with his pastor prior to testifying and therefore effectively denied him the right to testify at his own trial. We do not agree.

The record shows that the trial judge was willing to insure that the conversation was out of the hearing of anyone, but only insisted that it be done within the courtroom. This was completely reasonable. What was unreasonable was appellant's demand for absolute privacy. There appears to be no legitimate basis for his demand and, in fact, the pastor himself never voiced any requirement for such absolute privacy. Furthermore, appellant's immediate belief that he had drawn the judge into reversible error would seem to indicate that what he

really wanted was an adverse ruling rather than the right to talk to his pastor.

Affirmed.

HATHAWAY and BIRDSALL, JJ., concur.